# 24-1678-CV

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

➤➤ ◄◄

HUDSON SHORE ASSOCIATES LIMITED PARTNERSHIP,
HAVEN ON THE HUDSON LLC, KENNETH LEVINSON,
HUDSON VALLEY PROPERTY OWNERS ASSOCIATION,

*Plaintiffs-Appellants,*

*v.*

STATE OF NEW YORK, NEW YORK STATE DIVISION OF HOUSING AND
COMMUNITY RENEWAL, VILLAGE OF NYACK, NEW YORK,
CITY OF POUGHKEEPSIE, NEW YORK,

*Defendants-Appellees.*

———————————

*On Appeal from the United States District Court
for the Northern District of New York*

## BRIEF FOR PLAINTIFFS-APPELLANTS
## WITH SPECIAL APPENDIX

Benjamin F. Neidl
HACKER MURPHY LLP
*Attorneys for Plaintiffs-Appellants*
200 Harborside Drive, Suite 300
Schenectady, New York 12305
518-270-1253

 PHP  (212) 719-0990
appeals@phpny.com

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................... iii

PRELIMINARY STATEMENT ...................................................................1

PRELIMINARY STATEMENT ...................................................................1

STATEMENT OF JURISDICTION............................................................1

ISSUES PRESENTED FOR REVIEW ........................................................2

STATEMENT OF THE CASE.....................................................................3

    A.  The ETPA, Generally.................................................................3

    B.  The 2023 Amendments at Issue .................................................6

    C.  The Proceedings in the District Court......................................10

STANDARD OF REVIEW ........................................................................14

SUMMARY OF ARGUMENT ..................................................................14

ARGUMENT .............................................................................................16

    I.    ETPA §8623(d), (e) and (f) ARE FACIALLY NULL
        AND VOID BECAUSE THEY OFFEND THE FOURTH
        AMENDMENT ...................................................................16

        A.  The Statute Offends the Fourth Amendment Because it
           Authorizes Warrantless Administrative Searches Without
           Any Opportunity for Pre-Compliance Review .................16

           1.  The District Court Erred in Fixating on the "Civil"
               Versus "Criminal" Consequences for Refusing the
               Search ......................................................................20

           2.  The District Court Erred in its Reasoning that the
               ETPA Authorizes More Narrow Searches Than
               in *Patel*, and by a Narrower Set of State Actors ........21

i

3. The District Court Erred in its Reasoning That the ETPA Allows Compliance Within "A More Generous Time" than the Ordinance in *Patel* .............................24

4. The District Court Erred in its Reasoning That the Fourth Amendment is Satisfied Because Searches "Only" Occur During ETPA Surveys and "Only" Occur if the Demanded Records are "Available." .....................25

5. The District Court Erred in its Reliance on the "Confidentiality" Provision of ETPA §8623(g)..........................27

B. The "Closely-Regulated Business Exception" Does Not Justify the Statute ..........................................................28

1. The "Closely-Regulated Business" Exception is Inapplicable ................................................................29

2. Even if the Exception Were Applicable, the Statute Does Not Satisfy the Exception's Reduced Test.........................37

II. ETPA §8623(f) IS FACIALLY NULL AND VOID BECAUSE IT OFFENDS DUE PROCESS GUARANTEED BY THE FOURTEENTH AMENTMENT...............................................41

A. The ETPA's Public Hearing Requirement Does not Satisfy Due Process ...........................................................46

B. The District Court Erred in its Post-Deprivation Hearing Analysis ....................................................................47

CONCLUSION .................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

<u>Ashwander v. Tennessee Valley Authority</u>, 297 U.S. 288 (1936) .........................42

<u>ATM One LLC v. Incorporated Village of Hemptstead</u>, 91 A.D.3d 585 (2d Dep't 2012) ................................................................................................ 35, 37

<u>Baker v. City of Portsmouth</u>, 2015 WL 5822659 (S.D. Oh. 2015) ................. 33, 37

<u>Brody v. Village of Port Chester</u>, 434 F.3d 121 (2d Cir. 2005) ..............................41

<u>Calvey v. Town of North Elba</u>, 2021 WL 1146283 (N.D.N.Y. 2021) ....................17

<u>Camara v. Municipal Court of City and County of San Francisco</u>, 387 U.S. 523 [1967] ..................................................................................................................17

<u>Chadwick Gardens Assocs. v. City of Newburgh</u>, 2024 WL 1788056 (S. Ct. Orange County, April 19, 2024) .................................................................... 10, 48

<u>City of Indianapolis v. Edmond</u>, 531 U.S. 32 (2000) ...........................................17

<u>City of Los Angeles v. Patel</u>, 576 U.S. 409 (2015) ........................................*Passim*

<u>Colonnade Catering Corp. v. United States</u>, 397 U.S. 72 (1970) .................... 30, 35

<u>Donovan v. Lone Steer</u>, 464 U.S. 408 (1984)..........................................................17

<u>Gibson v. Berryhill</u>, 411 U.S. 564 (1973).............................................................46

<u>Goldberg v. Kelly</u>, 397 U.S. 254 (1970)................................................................47

<u>Headley v. City of Rochester</u>, 272 N.Y. 197 (1936) ..............................................42

<u>Johnson v. Smith</u>, 104 F.4th 153 (10th Cir. 2024) ................................................30

<u>Katz v. United States</u>, 389 U.S. 347 (1967)..........................................................16

<u>Kritsky v. McGinnis</u>, 313 F. Supp. 1247 (N.D.N.Y. 1970)....................................47

<u>Loretto v. Teleprompter Manhattan CATV</u>, 458 U.S. 419 (1982).........................42

<u>Marquez v. Silver</u>, 96 F.th 579 (2d Cir. 2024).........................................................1

Marshall v. Barlow's, Inc., 436 U.S. 307 (1978).........................................25, 29, 33

Mount Kisco, 104 A.D.2d 964 (2d Dep't 1984)....................................................44

Mullane v. Central Hanover Bank & Trust, 339 U.S. 306 (1950)..........................41

People v. Weaver, 12 N.Y.3d 433 (2009).............................................................27

Players v. City of New York, 371 F.Supp.2d 522 (S.D.N.Y. 2005) .......................36

Routhier v. Goggins, 229 F. Supp. 3d 299 (D. Vt. 2017).....................................35

Seawall Assocs. v. City of New York, 74 N.Y.2d 92 (1989)..................................42

See v. City of Seattle, 387 U.S. 541 (1967)..........................................................17

Sierra Club v. Con-Strux, LLC, 911 F.3d 85 (2d Cir. 2018).................................14

Skinner v. Railway Labor Exec. Ass'n, 489 U.S. 602 (1989)................................17

Sokolov v. Village of Freeport, 52 N.Y2d 341 (1981)..........................................34

Spinelli v. City of New York, 579 F.3d 160 (2d Cir. 2009)...................................41

Spring Valley Gardens Assocs. v. Marrero, 100 A.D.2d 93 (2d Dep't 1984) ........44

United States v. Biswell, 406 U.S. 311 (1972) .....................................................31

**Statutes**

28 U.S.C. §1291 ...................................................................................................1

28 U.S.C. §1331 ...................................................................................................1

ETPA §8622 .........................................................................................................4

ETPA §8623..................................................................................................*Passim*

ETPA §8624 ...............................................................................................4, 5, 43

ETPA §8632-a...................................................................................................4, 43

ETPA §8625 .........................................................................................................4

ETPA §8626 ......................................................................................................5, 43

ETPA §8630(a) ...................................................................................5, 42

Real Property Actions and Proceedings Law §711(1)...............................5

Real Property Law §226(1)(a) ..............................................................4, 5

Real Property Law §226-C ......................................................................32

Real Property Law §235-b ......................................................................32

Real Property Law §235-e ......................................................................32

**Other Authorities**

*Rethinking Closely Regulated Industries*, 129 HARV. L. REV. 797 (Jan. 2016) 29, 31

**Regulations**

9 NYCRR §2503.5 ...............................................................................6, 43

9 NYCRR §2504.1 ...............................................................................6, 43

9 NYCRR §2504.2 ...............................................................................6, 43

9 NYCRR §2504.4 ..................................................................................6

**Constitutional Provisions**

U.S. Const. Amend IV ............................................................................16

U.S. Const. Amend. XIV .........................................................................41

## PRELIMINARY STATEMENT

Plaintiffs-Appellants Hudson Shore Associates Limited Partnership ("Hudson Shore"), Haven on the Hudson, LLC ("Haven"), Kenneth Levinson, and the Hudson Valley Property Owners Association ("HVPOA" and, collectively with Hudson Shore, Haven and Levinson, the "Appellants") respectfully submit this Appellant's Brief, appealing the District Court's Memorandum-Decision and Order dated May 28, 2024 (A624), Memorandum-Decision and Order dated June 10, 2024 (A616) and Judgment of dismissal dated June 10, 2024 (A621). For the reasons set forth below, those Orders and Judgment should be reversed.

## STATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §1331, because the case asserts "federal question" causes of action pursuant to the Fourth and Fourteenth Amendments of the United States Constitution. This Court has appellate jurisdiction pursuant to 28 U.S.C. §1291, because this is an appeal from a final Order and Judgment of dismissal by the District Court (A616, A621) and an interlocutory Order that has merged into the final Judgment (A624). *See* Marquez v. Silver, 96 F.th 579, 582 (2d Cir. 2024)("Once a final judgment has been entered, interlocutory orders typically merge with the [final] judgment for purposes of appellate review.").

1

## ISSUES PRESENTED FOR REVIEW

I.     With regard to the Appellants' challenges pursuant to the Fourth Amendment of the United States Constitution:

    A.    Whether New York State Emergency Tenant Protection Act ("ETPA") §8623(d), (e) and (f) offend the Fourth Amendment, by purporting to authorize warrantless administrative searches of landlords' business records without any opportunity for pre-compliance review; and

    B.    Whether ETPA §8623(d), (e) and (f) are saved by the so-called "closely-regulated industry exception" to the pre-compliance review requirement for administrative searches, including the sub-issues of:

    (i)    Whether the exception applies to the residential premises rental industry; and

    (ii)    If so, whether the ETPA subdivisions satisfy the lower constitutionality threshold of the exception, namely whether the warrantless search is necessary to further the regulatory scheme, and whether the scheme includes safeguards that are an adequate substitute for a warrant.

II.     Whether ETPA §8623(f) offends the Due Process Clause of the Fourteenth Amendment of the United States Constitution, by denying "responding" landlords the opportunity to be heard on a critical issue that affects their property interests:

namely, whether there are sufficient vacancies in the rental inventories of "non-responding" landlords to disqualify the locality from adopting ETPA rent stabilization.

**STATEMENT OF THE CASE**

**A.    The ETPA, Generally**

New York State adopted the Emergency Tenant Protection Act ("ETPA") in 1974. It is codified in Title 23, Chapter 5 of the New York State Unconsolidated Laws. The original version of the Act authorized only certain municipalities in New York State (in downstate counties such as Westchester and Nassau) to declare a "housing emergency" under certain circumstances, and to opt into a rent stabilization program similar to New York City's, to mitigate rent inflation purportedly caused by housing emergencies.

In 2019 the ETPA was expanded, by amendment, to allow *any* municipality in New York State to declare a "housing emergency" under certain circumstances, and opt into the ETPA rent stabilization program to mitigate the rent inflation purportedly caused by housing emergencies.  Essentially, a locality can declare a "housing emergency" under the ETPA if it conducts a residential rental study and determines that the local vacancy rate is 5% or less.  *See* ETPA §8623(a). The emergency "must be declared at an end" if and when the vacancy rate exceeds 5%. *Id.* §8623(b).

Local ETPA rent stabilization programs are overseen by Defendant New York State Division of Housing and Community Renewal ("HCR"). After a local declaration of emergency, HCR and the locality collaborate on the appointment of a local "Rent Guidelines Board," which has rent regulation powers described below. *See* ETPA §§8624, 8623.

The implementation of ETPA rent stabilization in a locality drastically changes the landlord-tenant relationship in covered housing[1] and, by extension, significantly curtails the landlord's control over its rental property. In *non*-rent-stabilized communities, the rental amount and the tenancy duration are freely negotiable between landlord and tenant. Indeed, the ETPA itself recognizes that outside of those communities with declared "emergencies," "a normal market of free bargaining between landlord and tenant [is] the ultimate objective of state policy." ETPA §8622. The only substantive restriction in non-ETPA communities is that the landlord must provide the tenant with advance written notice if the landlord intends to raise the rent by more than 5%. *See* N.Y. Real Property Law §226(1)(a).

In contrast, in ETPA localities, the rental rates of ETPA-covered properties are highly controlled. Within 90 days of the adoption of the ETPA in a locality, landlords of covered properties must register with HCR. ETPA §8632-a. Rental

---

[1] Some housing accommodations are exempt from ETPA rent-stabilization including, without limitation, properties with fewer than 6 rental units, and properties that were constructed or substantially rehabilitated after January 1, 1974. ETPA §8625.

rates are initially frozen for those properties, at whatever rate the landlord was charging immediately before ETPA adoption. Id.; *see also* ETPA §8626. Thereafter, the Rent Guidelines Board establishes "annual guidelines for rent adjustments which, at its sole discretion may be varied and different and within several zones and jurisdictions of the board." ETPA §8624(b).

In addition to the control of rental rates, ETPA properties are subject to strict controls on the duration and renewal of tenancies. By comparison, *outside* of ETPA localities, in the "free market," generally New York law allows a landlord to non-renew any tenant at-will, as long as the landlord provides the tenant with advanced written notice. *See* N.Y. Real Property Law §226-c(1)(a). In such unregulated communities, the landlord may evict any tenant, in a summary proceeding, for holding over at the premises "without the permission of the landlord." N.Y. Real Property Actions and Proceedings Law §711(1). In contrast, in ETPA localities, when an existing tenant's lease is expiring, the landlord of an ETPA-covered property is generally required to offer the tenant a renewal lease on substantially the same terms, as long as the tenant is paying the regulated rent—the tenant gets to choose if the renewal lease is for one year or two. ETPA §8630(a)(providing that HCR's ETPA regulations must "require owners to grant a new one or two year

vacancy or renewal lease at the option of the tenant"). This is reinforced in HCR's ETPA regulations. *See* 9 NYCRR §2503.5, 2504.1 and 2504.2.[2]

Suffice it to say, a landlord's degree of control over its rental property is much more restricted under an ETPA regime than it is outside one. Thus, the accurate declaration of a threshold housing "emergency" under the ETPA (*i.e.*, a finding that the vacancy rate is 5% or less) is important.

**B.** **The 2023 Amendments at Issue.**

Effective December 8, 2023, the State amended ETPA §8623, adding new subdivisions (d), (e), (f) and (g). Section 8623 is the statute that governs the critical threshold issue of whether a locality has a *bona fide* ETPA housing emergency. *i.e.*, whether "the vacancy rate for the housing accommodations within such municipality is not in excess of five percent." *Id.* §8623(a).

Prior to the December 8, 2023 amendments, localities performing vacancy studies under §8623 have generally done so by conducting surveys of landlords within the municipality. For example, the Cities of Kingston and Newburgh, in recent years, sent written survey questionnaires to landlords, asking the landlords to identify the number of rental units in their buildings, and the number of rental units that were vacant and available for rent at the time.

---

[2]     There are limited exceptions to this, such as when the tenant commits certain "wrongful acts" such as failure to pay the regulated rent, or committing a nuisance, *etc. See* 9 NYCRR §2504.2; 9 NYCRR §2504.4.

The new subdivisions that were added by the December 8, 2023 amendments now require landlords to disclose more material when a locality conducts its vacancy study, and they require localities to make certain critical assumptions when a landlord fails to respond to the survey.

The new subdivision (d) of §8623 provides as follows:

> (d) When requested by a municipality or a designee, as a part of a study to determine its vacancy rate, owners … shall provide the most recent records of rent rolls and, if available, records for the preceding thirty-six months. Such records shall include the tenant's relevant information relating to finding the vacancy rate of such municipality including but not limited to the name, address, and amount paid or charged on a weekly, monthly, or annual basis for each occupied housing accommodation and which housing accommodations are vacant at the time of the survey and available for rent. Such records shall also include any housing accommodations that are vacant and not available for rent and provide the reason why such unit is not available for rent.

(Emphasis added.)

Subdivision (d) in other words, is not satisfied to have the landlord report the number of units and the number of vacancies, but also to keep and turn over business records for inspection upon demand.

Subdivision (d) purports to grant municipalities discretion in the types of information demanded. Indeed, it provides that the landlord must produce the "***tenant's relevant information*** relating to finding the vacancy rate … ***including but not limited to*** the name, address, and amount paid or charged on a weekly, monthly,

or annual basis for each occupied housing accommodation" (emphasis added). The "including but not limited to" language purports to empower a locality conducting a vacancy study to request other tenant information that it deems "relevant," beyond the name, address and rental amount paid by the tenant.

Section 8623(d) does not require the locality to obtain a warrant from a court. The statute does not grant the property owner any opportunity for pre-compliance review of the locality's demand for records or information, by a neutral third party or tribunal.

The new subdivision (e) of §8623 subjects the landlord to summary punishment for failure to comply:

> A municipality may impose a civil penalty or fee of up to five hundred dollars on an owner or their agent if the owner or their agent refuses to participate in such vacancy survey and cooperate with the municipality or a designee in such vacancy survey, or submits knowingly and intentionally false vacancy information.[3]

Thus, a landlord who refuses to cooperate with the warrantless demand for records or information is subject to the summary monetary penalty.

Moreover, the penalty for non-compliance is not limited to a $500 fine. The new subdivision (f) of §8623 provides as follows:

> A nonrespondent owner shall be deemed to have zero vacancies.

---

[3] The initial amendment of December 8, 2023 set the maximum penalty at $1,000. The State revisited this a few months later, and amended the law again to set the maximum penalty at $500 on March 1, 2024. (*Compare* Complaint Exhibits B and C.)

This means that if a landlord has vacancies but fails to respond to the survey for *any* reason, the landlord will be deemed to have no vacancies. Even if a landlord's non-response is due to an innocent circumstance, such as the survey form being lost in the mail, or the landlord being away at the time that the information is requested, that landlord's vacancies will be excluded from the vacancy rate calculation.

The exclusion of only a few vacancies from a vacancy rate calculation can make a dipositive difference in determining whether a locality has an ETPA-qualifying emergency or not. As noted, under ETPA §8623, a locality may declare an emergency (and adopt ETPA rent regulation) if the vacancy rate is 5% or less. By way of illustration, recently, the City of Newburgh, New York declared an ETPA emergency, based on the following calculation:

$$\frac{29 \text{ Vacant Units Available for Rent}}{738 \quad \text{Units Included In Survey}} = 0.03929 = 3.929\% \text{ vacancy rate}$$

However, subsequently, the owners of four apartment buildings successfully complained in State Court litigation, that Newburgh wrongfully failed to count 13 reported vacancies in the surveyed buildings. In that case, the State Court restored those 13 vacancies to the vacancy rate calculation, which resulted in a vacancy rate of greater than 5%:

$$\frac{42 \text{ Vacant Units Available for Rent}}{738 \text{ Units Included In Survey}} = 0.0569 = 5.691\% \text{ vacancy rate}$$

*See* Chadwick Gardens Assocs. v. City of Newburgh, 2024 WL 1788056 (S. Ct. Orange County, April 19, 2024). Chadwick Gardens demonstrates that even relatively small numbers of omitted vacancies (13) from the owners of just a few properties (4), can have a determinative mathematical impact in the calculation of whether a locality meets the ETPA's 5%-or-less threshold for an "emergency." Therefore, summarily deeming a few non-responding landlords as having 0 vacancies—or even deeming one non-responding landlord as such—can subject an entire community to an extremely consequential regulatory watershed.[4]

## C.  The Proceedings in the District Court

The Appellants commenced this action in the United States District Court for the Northern District of New York by filing a Complaint on March 18, 2024, followed by an Amended Complaint on March 25, 2024, 2024.  (A9 – A175.) Appellants Hudson Shore, Haven and Levinson  are New York State residential landlords in localities that were then engaged in vacancy examinations under the ETPA to one degree or another.   The Amended Complaint challenged the

---

[4]     The landlords with uncounted vacancies in Chadwick Gardens *did* respond to the City of Newburgh's survey and *did* report their vacancies (they were not "non-responding" landlords). Newburgh's tabulation nevertheless failed to count these reported vacancies for miscellaneous "factual" reasons the State court deemed speculative, arbitrary and capricious.  But, although Chadwick Gardens does not involve the omission of *non-responding* landlords, it makes the point that the margins in these vacancy studies can be very tight, such that the exclusion of only a few vacancies can make the difference between a locality being ETPA eligible or not.  Thus, ETPA §8623(f)'s edict to treat non-responding landlords as having zero vacancies means that even one or two landlords' failure to respond to the survey and report their actual vacancies can subject an entire locality to the major transformation of an ETPA rent stabilization program.

constitutionality of ETPA §8623(d), (e) and (f) on Fourth and Fourteenth Amendment grounds, asserting the following causes of action: (i) request for declaratory judgment decreeing that ETPA §8623(d) and (e) are facially unconstitutional and void for violation of the Fourth Amendment; (ii) request for declaratory judgment decreeing that ETPA §8623(f) is facially unconstitutional for violation of the Fourteenth Amendment Due Process clause; and (iii) a claim under 42 U.S.C. §1983 for illegal searches already conducted of Hudson Shore and Haven under the ETPA. (A21 – A27.)

The Amended Complaint named the State of New York as a defendant, as the State government that adopted and maintains the disputed statutory amendments. It also named HCR as a defendant, inasmuch as HCR might be affected by a final judgment decreeing the subdivisions to be unconstitutional—HCR is the State agency charged with overseeing ETPA rollouts in localities that declare ETPA "emergencies" and opt-in to ETPA rent stabilization.

The Amended Complaint also named two localities as defendants, because a final judgment decreeing the contested statutory subdivisions unconstitutional might have also affected the affairs of those localities: the City of Poughkeepsie, New York and the Village of Nyack, New York.

The rental property owned by Appellant Levinson is in Poughkeepsie, and when this action was commenced, Poughkeepsie was in the process of completing a

vacancy rate study. (A227- A 238.) (Poughkeepsie released its initial vacancy rate findings in April 2024, after the Appellants commenced the District Court action. [A408]).

Appellants Hudson Shore and Haven's residential rental properties are located in Nyack. (A211, A222.) In 2023 Nyack conducted two vacancy studies in swift succession (within a few months of each other), both of which resulted in findings that Nyack's vacancy rate was above 5% (not ETPA-eligible). (A39 - A91, A92 – A171.) But Nyack was openly discussing the commencement of a third study with different survey methods. (A226.)

The Appellants named Poughkeepsie and Nyack as defendants in the event that those localities might be relying on the statutory subdivisions that are the subject of this dispute, in which case a judgment nullifying those subdivisions could upend or negate the localities' vacancy study activities (thus, possibly making them necessary parties who would be "affected by" the final judgment).

On March 25, 2024, the Appellants moved for a preliminary injunction, to halt the enforcement and use of ETPA §8623(d), (e), and (f). (A178 – A239.) On May 3, 2024, the Defendants-Respondents ("Respondents") each filed oppositions to the motion for preliminary injunction and filed motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). (A269 – A464.) The Appellants subsequently filed reply papers

in further support of the injunction motion, and oppositions to the motions to dismiss. (A471 – A535.)

On May 28, 2024, the District Court issued a Memorandum-Decision and Order denying the motion for preliminary injunction. (A624.) In its discussion of the "likelihood of success on the merits" prong of the injunction analysis, the District Court effectively held that the Appellants' claims failed as a matter of law, for reasons addressed in the ARGUMENT section of this brief, below. On June 10, 2024, the District Court issued a second Memorandum-Decision and Order and a Judgment granting the motion to dismiss by New York State and HCR, dismissing the action it its entirety. (A616, A621.) In the same Order, the District Court denied, as moot, the motions to dismiss by Poughkeepsie and Nyack. (A619.) The Appellants timely appealed. (A613.)

The District Court's Memorandum-Decision and Order of dismissal essentially incorporated by reference the analysis of the Memorandum-Decision and Order denying the injunction motion. (A618.) Therefore, most of the District Court's substantive analysis being reviewed on this appeal is recited in the injunction Memorandum-Decision and Order (A624 – A641.)

## STANDARD OF REVIEW

"[The Courts of Appeal] review *de novo* the grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim, accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." Sierra Club v. Con-Strux, LLC, 911 F.3d 85 (2d Cir. 2018).

## SUMMARY OF ARGUMENT

Subdivisions (d), (e) and (f) of ETPA §8623 are facially unconstitutional and void because they subject New York State landlords to warrantless administrative searches during a locality's ETPA rental vacancy study, in deprivation of the landlords' rights under the Fourth Amendment. These subdivisions require landlords to turn over three years' worth of business records and any other information that the locality deems "relevant," without offering landlords any form of pre-compliance review. Failure to comply with the records request may subject the landlord to a summary penalty of up to $500 and summarily exclude the landlord's vacancies from the vacancy study. Appellants Hudson Shore and Haven each own apartment complexes in the Village of Nyack. During Nyack's vacancy study, Nyack violated Hudson Shore and Haven's Fourth Amendment rights by compelling the production of their business records without a warrant or an opportunity for pre-compliance review. (A212 – A215, A223 – A225.)

Subdivision (f) of §8623 is facially unconstitutional and void because it provides that a landlord who does not respond to a locality's survey "shall be deemed to have zero vacancies." The law fails to give other landlords notice and an opportunity to be heard on the number of vacancies a non-responding landlord actually has—a critical issue that will substantially impair the property rights of the *entire* covered landlord community, if the "auto-zero" treatment of non-responding landlords results in the adoption of rent stabilization in the locality. Appellant Levinson owns an apartment building in Poughkeepsie. Poughkeepsie released its final vacancy calculation on June 18, 2024 (after this case was dismissed), finding a vacancy rate of 4.03%, and declaring an ETPA emergency.[5] In its study, Poughkeepsie relied on ETPA §8623(f)'s edict that non-responding landlords be treated as having 0 vacancies.

---

[5]     Poughkeepsie initially published its vacancy study results in April 2024, at which time it reported a rate of 3.96%. (A357-58.) Poughkeepsie revised its calculation in a June 18, 2024 Resolution (numbered "R-24-45"), increasing the rate to 4.03%. Resolution R-24-45 is not in the Record or Appendix because it occurred after this case was dismissed from the District Court, but it is a matter of public record, published on Poughkeepsie's website: https://cityofpoughkeepsie.com/DocumentCenter/View/3361/R-24-45-Resolution-Declaring-A-Housing-Emergency

## ARGUMENT

### POINT I

**ETPA §8623(d), (e) and (f) ARE FACIALLY NULL AND VOID BECAUSE THEY OFFEND THE FOURTH AMENDMENT.**

**A.**    **The Statute Offends the Fourth Amendment Because it Authorizes Warrantless Administrative Searches Without Any Opportunity for Pre-Compliance Review.**

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend IV. "[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Id. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Arizona v. Grant, 556 U.S. 332, 338 (2009) , *quoting* Katz v. United States, 389 U.S. 347, 357 (1967). "This rule applies to commercial premises as well as to homes." City of Los Angeles v. Patel, 576 U.S. 409, 420 (2015).

One such exception is what the Supreme Court has called an "administrative search": a search conducted for a primary purpose other than "crime control," and where "special needs make the warrant and probable cause requirement

impracticable." Patel, 576 U.S. at 420, *quoting* Skinner v. Railway Labor Exec. Ass'n, 489 U.S. 602, 619 (1989). *See also* City of Indianapolis v. Edmond, 531 U.S. 32, 44 (2000). Some examples of administrative searches include interior building safety inspections by local building code officers (Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523 [1967]), fire safety inspections by fire officials (See v. City of Seattle, 387 U.S. 541 [1967]), and safety drug and alcohol testing of certain public mass transit employees (Skinner).

"[I]n order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain pre-compliance review before a neutral decisionmaker." Patel, 576 U.S. at 421; *see also* Calvey v. Town of North Elba, 2021 WL 1146283, at *8 (N.D.N.Y. 2021). The subject of the search must be given an opportunity to "question the reasonableness of the subpoena, before suffering any penalties for refusing to comply with it []." Donovan v. Lone Steer, 464 U.S. 408, 415 (1984). Although the Supreme Court "has never attempted to prescribe the exact form an opportunity for pre-compliance review must take," an inspection scheme that does not offer "any opportunity whatsoever … is facially invalid." Patel, 576 U.S. at 421.

In Patel, the Supreme Court considered a local law that required hotel operators to record information about their guests, including "the guest's name and address, the number of people in each guest's party, the make, model and license

plate number of any guest's vehicle parked on hotel property," as well as the guest's arrival and departure dates, and room number. 576 U.S. at 412-13. The law further required the hoteliers to make this information "available to any officer of the Los Angeles Police Department for inspection" upon demand. Id. at 413. Refusal to cooperate could expose the hotel operator to a $1,000 fine, and a possible misdemeanor charge. Id. It was undisputed that the law did not offer hotel operators any opportunity for pre-compliance review. The Court held that the local law was facially invalid:

> Absent an opportunity for pre-compliance review, the ordinance creates an intolerable risk that searches authorized by it will exceed statutory limits, or be used as a pretext to harass hotel operators and their guests. Even if a hotel has been searched 10 times a day every day, for three months, without any violation being found, the operator can only refuse to comply with an officer's demand to turn over the registry at his or her own peril. … [A] hotel operator must be afforded an opportunity to have a neutral decisionmaker review an officer's demand to search the registry before he or she faces penalties for failing to comply.[6]

Id. at 421.

In this case, ETPA §8623(d) is highly comparable. The law in Patel required hotel owners to disclose various data about hotel guests, and §8623(d) requires landlords to produce various data about their current and former tenants, as well as

---

[6] The Court rejected the argument that a hotel operator's right to pre-compliance review can be satisfied by running to court to seek a quash order. Id. at 422.

business records pertaining to present and past rental transactions ("rent rolls and …
records for the preceding thirty-six months," "the tenant's relevant information…
including but not limited to the name, address and amount paid or charged [for
rent]").  The search latitude granted to localities in §8623(d) is, in fact, even broader
than the law in Patel, because it goes beyond specifically enumerated items like 36
months of rent rolls, and also permits discovery of any of "the tenant's *relevant
information* relating to finding the vacancy rate, *including but not limited to*" things
like the tenant's name, address and rental rates paid (emphasis added). Localities are
apparently authorized to decide for themselves what else is "relevant," and landlords
have no opportunity for pre-compliance review by a neutral arbiter.

Like the law at issue in Patel, the landlord faces summary penalties for non-
compliance.  ETPA §8623(e) subjects the landlord to a summary penalty of up to
$500, and §8623(f) subject the landlord to the dire consequence of having its
vacancies excluded from the calculus of the vacancy rate.  Here again, there is no
opportunity for review.

ETPA §8623(d), (e) and (f) are collectively every bit as facially
unconstitutional as the law in Patel.

The District Court purported to distinguish Patel on several grounds that do
not withstand scrutiny.

19

### 1. The District Court Erred in Fixating on the "Civil" Versus "Criminal" Consequences for Refusing the Search.

First, the District Court observed that in Patel, a hotelier's refusal to produce records was "punishable by up to six months in jail and a $1,000 fine" (Patel, 576 U.S. at 413) whereas under ETPA §8623(e) and (f), a landlord's penalty for refusal is a "civil penalty or fee of up to five hundred dollars," and a presumption that the landlord has "zero vacancies." (A633-34.) The District Court reasoned, "as there is no criminal penalty [under the ETPA], the risk of harassment or abuse is … reduced []" compared to the ordinance in Patel. (A634.)

That reasoning is unsustainable for several reasons.

For one thing, Appellant's counsel has searched far and wide for any authority suggesting that a state actor can charge a citizen a $500 civil penalty for exercising its constitutional rights, and has found none. The District Court also cites no authority for that untenable proposition. Certainly, the government could not constitutionally charge an arrestee a $500 civil penalty for exercising his right to request counsel under the Sixth Amendment. It is equally elementary that the government could not constitutionally charge a citizen a $500 civil penalty for exercising her First Amendment right to go to the church of her choosing. Likewise, it is absurd to suggest that the government can charge a landlord a $500 civil penalty for exercising his right to refuse a warrantless search of his business records by state actors who have offered him no opportunity for pre-compliance review. The ETPA

may not expose the landlord to the risk of incarceration, but it still intrudes on his Fourth Amendment rights by exposing him to an unwanted search or a summary penalty of $500.

Moreover, the District Court overlooked the fact that the consequences go beyond the civil penalty of ETPA §8623(e)—the consequences also include the presumption of zero vacancies under subdivision (f). If the landlord actually has vacancies but is presumed to have no vacancies as a punishment for refusing to turn over the demanded records, it increases the likelihood that the locality will calculate a vacancy rate below 5%. (*See* pg. 9, *supra*, and pg. 43-44, *infra*.) That exposes the landlord (and other landlords in the locality) to a drastic outcome: community-wide rent stabilization. That stands to coerce landlords to capitulate to the warrantless searches.

### 2. The District Court Erred in its Reasoning that the ETPA Authorizes More Narrow Searches Than in *Patel*, and by a Narrower Set of State Actors.

Next, the District Court reasoned that ETPA §8623 is less offensive than the ordinance in Patel because the ETPA "only permits the municipality or its designees review a small subset of information []." (A634.) The District Court reasoned, "That only a small set of actors—i.e., a municipality and its designees—can request records greatly reduces the risk landlords could be "harassed." (*Id.*) Those conclusions are wrong.

First, the ETPA does not authorize only a "small subset of information." It grants municipalities unfettered discretion to demand whatever records they deem "relevant":

> When requested by a municipality or a designee, as a part of a study to determine its vacancy rate, owners, or their agent, of housing accommodations in the class of housing accommodations determined, shall provide the most recent records of rent rolls and, if available, records for the preceding thirty-six months. ***Such records shall include the tenant's <u>relevant information</u> relating to finding the vacancy rate of such municipality including <u>but not limited to</u>*** the name, address, and amount paid or charged on a weekly, monthly, or annual basis for each occupied housing accommodation and which housing accommodations are vacant at the time of the survey and available for rent. Such records shall also include any housing accommodations that are vacant and not available for rent and provide the reason why such unit is not available for rent.

ETPA §8623(d)(emphasis added). There is no statutory or regulatory guidance, or guardrails, on what a municipality might deem "relevant information." In contrast, the ordinance in Patel offered no discretionary margin, requiring only that hotels produce the following, specifically-enumerated information.

> [T]he guest's name and address; the number of people in each guest's party; the make, model, and license plate number of any guest's vehicle parked on hotel property; the guest's date and time of arrival and scheduled departure date; the room number assigned to the guest; the rate charged and amount collected for the room; and the method of payment

576 U.S. at 412-13. Therefore, the ETPA does not contemplate a "smaller subset of information" than the law in Patel.

Second, the ETPA also does not confer the search authority on a "small[er] set of actors" than in Patel. In Patel, the examination of hotel records could be made only by "any officer of the Los Angeles Police Department" (576 U.S. at 413)—that is, trained law enforcement officers of one particular agency (the police department). In contrast, ETPA §8623(d) is broader, allowing that the examination of the landlord's records may be made by the "municipality or a designee"—presumably any agency of the municipality, or even private contractors ("designees") or consultants that it may hire to help with the vacancy study.

Third, even if the ETPA merely authorized searches of a "smaller subset" of information by a "smaller set of actors" than in Patel (which it does not), that does not quell the offenses to the Fourth Amendment. The District Court did not cite any authority—and upon information and belief, there is no authority—for the proposition that a warrantless search made without an opportunity for pre-compliance review may be constitutional if the search is conducted by a "small" number of people, of a "discrete" thing or place. The warrantless search of a single handbag by a single police officer is perhaps as discrete as it gets, and yet it still violates the Fourth Amendment in the absence of an exception to the warrant requirement. Accordingly, the District Court's assertion that ETPA search is

"smaller" than it could be, and authorized to a "smaller" body of state actors, is factually and doctrinally unsustainable.

**3.      The District Court Erred in its Reasoning That the ETPA Allows Compliance Within "A More Generous Time" than the Ordinance in _Patel_.**

The District Court also reasoned that ETPA §8623 passed muster because it "allows landlords to provide information within a far more generous timeframe" than the hotel law in Patel.  (A634.)  That is a dubious conclusion.

First, §8623 does not say anything about the timeframe for a landlord's response to the demand. There is nothing in the statute that would prohibit the municipality from demanding the records immediately, or on short notice.

Second, even if the statute afforded a "more generous timeframe" (which it does not) it would not matter.  An unlawful search conducted slowly is still an unlawful search.  The facial defect in Patel was that the statutory scheme offered no pre-compliance review remedy.  576 U.S. at 410 (holding that the Los Angeles hotel law was "facially invalid because it fails to afford hotel operators any opportunity for pre-compliance review. To be clear, a hotel owner must only be afforded an opportunity for pre-compliance review []").  The same is true of the ETPA.  Even if a municipality chose to give the landlord a "generous" time to produce the records, the ETPA does not require municipalities to entertain any objection or appeal process by the landlord.   It allows the summary imposition of a $500 civil penalty

and the adverse presumption that the landlord has zero vacancies. ETPA §8623(e) and (f). As in Patel, there is no remedy for pre-compliance review.

**4. The District Court Erred in its Reasoning That the Fourth Amendment is Satisfied Because Searches "Only" Occur During ETPA Surveys and "Only" Occur if the Demanded Records are "Available."**

The District Court further opined that the Fourth Amendment concerns are mitigated because "a municipality or its designees can only request information if that information is "part of a study to determine vacancy rates'" and "a records request can only be made if the records are available." *Citing* ETPA §8623(d). (A634.)

The first point—that records requests may only be made as part of a vacancy study—is no mitigation at all. That is like saying police can conduct warrantless searches as long as the search is part of an "investigation." Virtually every governmental search, whether it is a criminal search of a suspect's home or an administrative search of business property, is undertaken as part of some kind of governmental investigation or inspection. That does not make searches constitutional. Take, for example, Marshall v. Burlow's, 436 U.S. 307 (1978). In that case, the Supreme Court reviewed a section of OSHA that authorized the Department of Labor to investigate safety hazards in industrial workplaces and, as part of that grant, authorized the Department to conduct warrantless safety inspections of such facilities. Id. at 309. To employ the District Court's reasoning

in this case, the OSHA provision would be constitutional because, after all, the warrantless inspections are undertaken "only" as part of a safety investigation. But that is not how the Supreme Court saw it. The Court had no difficulty decreeing the law to be unconstitutional: "We hold that [the business] was entitled to a declaratory judgment that the Act is unconstitutional insofar as it purports to authorize inspections without warrant or its equivalent []." Id. at 325.

The District Court's second point—that the ETPA searches occur only if the requested records are "available"—is equally confounding. Obviously, non-existent property cannot be searched, legally or illegally. That is no relief where searchable property *does* exist. Suppose that the police conduct warrantless searches of purses of every woman who enters a nightclub carrying a purse—would that practice be constitutional merely because the police did *not* search the women who were *not* carrying purses (*i.e.*, the women as to whom purses were not "available")? Of course not. Likewise, in this case, the fact that some landlords may have no records to search, or some landlords may have more records than others available to search, does not remotely alleviate the constitutional deprivation that occurs each and every time the government conducts a search of the existing, "available" records without a warrant or its equivalent.

5.     **The District Court Erred in its Reliance on the "Confidentiality" Provision of ETPA §8623(g)**

The District Court also reasoned that the Fourth Amendment tolerates ETPA §8623 because subdivision (g) provides that "Identifying data or information shall be kept confidential and shall not be shared, traded, given, or sold to any other entity for any purpose outside of such vacancy study."  (A634-35.)

This conclusion is untenable.  There is no "we promise to keep it confidential" exception to the Fourth Amendment.  It is self-evident that a police officer conducting a warrantless search of a home, office or car cannot satisfy the Fourth Amendment merely by promising the owner he will keep secret the non-incriminating contents of the searched property.  Likewise, State of New York and municipalities conducting ETPA studies cannot satisfy the Fourth Amendment merely by offering to keep the "identifying information" of tenants confidential.  The fundamental purpose of the Fourth Amendment is not to help guilty individuals conceal evidence of crimes, it is to protect the "personal privacy" of the innocent.  People v. Weaver, 12 N.Y.3d 433, 441 (2009).  The Fourth Amendment recognizes that through a warrantless search, the government might discern any number of non-criminal, but "private" details about a person that would offend his or her expectation of privacy.  Id. at  442-43 (holding warrantless use of GPS device on motor vehicle unconstitutional, noting the potential invasions of privacy through monitoring "trips [of a] private nature [such as] rips to the psychiatrist, the plastic surgeon, the abortion

clinic, the AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue or church, the gay bar and on and on"). The very premise of search and seizure law is that the mere exposure of private information *to the government*, without probable cause and a warrant (or pre-compliance review for an administrative search), is the constitutional violation. The government cannot sidestep that by saying it will "keep mum" about what it saw. The District Court did not cite any authority for the proposition that the government can placate the Fourth Amendment by promising confidentiality and, upon information and belief, there is no such authority.

## B. The "Closely Regulated Business Exception" Does Not Justify the Statute.

In the alternative, the District Court *sua sponte* held that localities conducting ETPA studies are exempt from the warrant requirement anyway, invoking the "closely regulated business exception" that the Supreme Court has applied to a scant four types of industries. (A635.) Upon information and belief, no other court has ever held that this narrow exception applies to residential rentals, and at least several courts have held that the exception does not apply to the rental industry. The District Court's novel holding to this effect was truly *sua sponte*, in that none of the Respondents argued the exception below and, therefore, none of the parties briefed the applicability of the exception in the District Court. The District Court's *sua sponte* holding was error.

**1. The "Closely Regulated Business" Exception is Inapplicable.**

As discussed above, Patel and other Supreme Court precedent establish that in the case of "administrative searches" (searches conducted for a reason other than crime control or detection), the warrant requirement may be excused, but only if the statutory or regulatory scheme offers the search target an opportunity for "pre-compliance review before a neutral decisionmaker." Patel, 576 U.S. at 420.

Patel recognizes a "narrow exception" to this rule, in the so-called "closely-regulated business exception" (sometimes called the "pervasively-regulated industry exception"). Id. at 424. The gist of this exception is that certain industries that pose "a clear and significant risk to the public welfare" (Id.) are so intensively-regulated that practitioners of those industries have "no reasonable expectation of privacy" (Marshall v. Barlow's, Inc., 436 U.S. 307, 313 [1978]) and, therefore, searches may be made without pre-compliance review remedies under certain circumstances. *See also Rethinking Closely Regulated Industries*, 129 HARV. L. REV. 797 (Jan. 2016)(reporting history of the exception). In Patel, the Supreme Court held that the "closely-regulated business exception" did not apply to the hotel industry. 576 U.S. at 424-28. In contrast, in the present case, the District Court found, *sua sponte* (in a case of first impression in this Circuit) that the exception *does* apply to the residential property rental industry. The District Court's holding is error.

The Supreme Court has only recognized four industries that are so pervasively regulated as to have "no expectation of privacy" and, thus, fall within the exception: (i) firearms dealing; (ii) alcohol distribution; (iii) mining; and (iv) automobile demolition (i.e., "junkyarding"). Patel, 576 U.S. at 524. Although this is not necessarily an exclusive list of the industries that may ever qualify as "closely regulated," "[a]n industry is more likely to be considered closely regulated if the federal government or the great majority of States have adopted similar inspection regimes." Johnson v. Smith, 104 F.4th 153, 171 (10th Cir. 2024). Moreover, Supreme Court case law has repeatedly emphasized that the exception must be applied narrowly, or else it would "swallow the rule." See Patel, 686 U.S. at 424-25; Marshall, 436 U.S. at 313 ("The clear import of our cases is that the closely regulated industry of the type involved in *Colonnade* and *Biswell* is the exception. The Secretary [of Labor] would make it the rule.") Indeed, virtually all businesses are regulated—but few legitimately fall within the elevated class of regulation that would defeat any expectation of privacy in the businesses property. *See* Marshall, 436 U.S. at 312-13 (holding that electrical and plumbing contractors were *not* "closely-regulated businesses" despite being regulated by OSHA and various other labor and employment regulations).

For a period of time after the Supreme Court first recognized the exception in Colonnade Catering Corp. v. United States, 397 U.S. 72 (1970)(recognizing firearms

dealing as closely-regulated industry) and United States v. Biswell, 406 U.S. 311 (1972)(recognizing mining as closely-regulated industry), some lower courts began to accept a more lax, and inclusive scope of industries within the "closely-regulated" exception. See , 129 HARV. L. REV. 797 *supra*. However, in Patel, the Supreme Court admonished that the exception was reserved for industries that pose a clear and present danger to the public welfare, and that expanding the exception to just "any" regulated industry would overwhelm the exception. As the Court explained:

> Over the past 45 years, the Court has identified only four industries that 'have such a history of government oversight that ***no reasonable expectation of privacy ... could exist*** for a proprietor over the stock of such an enterprise," *Barlow's, Inc.*, 436 U.S., at 313, 98 S.Ct. 1816. Simply listing these industries refutes petitioner's argument that hotels should be counted among them. Unlike liquor sales, *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970), firearms dealing, United States v. Biswell, 406 U.S. 311, 311–312, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), mining, *Donovan v. Dewey*, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981), or running an automobile junkyard, *New York v. Burger*, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987), ***nothing inherent in the operation of hotels poses a clear and significant risk to the public welfare***. See, e.g., id., at 709, 107 S.Ct. 2636 ('Automobile junkyards and vehicle dismantlers provide the major market for stolen vehicles and vehicle parts'); *Dewey*, 452 U.S., at 602, 101 S.Ct. 2534 (describing the mining industry as 'among the most hazardous in the country').
>
> Moreover, '[t]he clear import of our cases is that the closely regulated industry ... is the exception.' *Barlow's, Inc.*, 436 U.S., at 313, 98 S.Ct. 1816. ***To classify hotels as***

> ***pervasively regulated would permit what has always been***
> ***a narrow exception to swallow the rule***.

Id. at 424-25 (emphasis added).  Accordingly, though hotels are subject to regulation and are charged with maintaining safe and secure lodgings for their guests, the Court held that the hotel industry does not rise to the rarified level of "closely-regulated" within the meaning of the Fourth Amendment exception.

The residential landlord-tenant industry, likewise, is not a "closely-regulated" industry.  In New York State, landlords are not licensed, and there is no State agency charged generally with regulating landlords or the renting of premises *per se*.  In Real Property Law Article 7, New York law includes a general chapter of statutes that impose certain rights and obligations on landlords and tenants.  This is essentially a compendium of "dos and don'ts," such as do ensure that the premises are fit for human habitation (Real Property Law §235-b), do give the tenant receipts acknowledging the payment of rent (Real Property Law §235-e), do give the tenant notice before non-renewing a lease or raising the rent (Real Property Law §226-C), etc., but do not impose discriminatory conditions on occupancy (Real Property Law §235-f), do not charge unreasonable fees for apartment keys (Real Property Law §235-i), do not harass tenants (Real Property Law §235-d), etc. A landlord can be civilly liable to the tenant for violating these statutes, but this is not a regulatory scheme on the order of the licensing regimes for firearms distribution, mining, alcohol distribution or the like, in which the risks are so great that the business has

forfeited its expectation of privacy, and regulators conduct impromptu inspections. These are general conduct- prescription laws, like OSHA and labor laws considered in Marshall, and the "hodge podge" of hotel operation laws considered in Patel.

For those communities that do opt into the ETPA rent stabilization program, there is a somewhat elevated degree of regulation (overseen by Respondent HCR), but those regulations primarily concern rental rates and tenancy durations, which are predominantly economic matters, not directed at controlling "clear and significant risk[s] to the public welfare." Patel, 576 U.S. at 424-25. Moreover, when municipalities conduct their record demands under ETPA §8623, that occurs *before* the locality has become enrolled in the ETPA regulation—indeed, the very purpose of the vacancy study is to ascertain whether the locality is even eligible for ETPA enrollment (*i.e.*, whether its vacancy rate is 5% or less). In other words, this records search is typically directed at landlords who are *not* already subject to ETPA regulation.

At least three cases have held that the closely-regulated business exception does not apply to the residential rental of property to tenants. One of those is Baker v. City of Portsmouth, 2015 WL 5822659 (S.D. Oh. 2015). In that case, a municipal local law required landlords to obtain a dwelling permit from the city in order to rent property. Getting the permit required the landlord to open the property to an in-person inspection for compliance with an 80-item checklist. Landlords brought suit

for a declaration that the ordinance's inspection requirement was an unlawful administrative search without pre-compliance review. The city argued that the rental industry was "closely-regulated" within the meaning of the exception, which the court rejected:

> In this case, the court similarly concludes that the rental of residential properties is not a closely regulated industry. See Sokolov, 52 N. Y.2d at 349 n.l ('Nor may it be said that the business of residential rental is of such a nature that consent to a warrantless administrative search may be implied from the choice of the appellants to engage in this business."). Defendants point to several sections of the Ohio's landlord-tenant statute (Ohio Rev. Code, Chapter 5321), to the Servicemembers Civil Relief Act, 50 App. U.S.C.A. § et seq., and to the Residential Lead-Based Pain Hazard Reduction Act of 1992, 42 U.S.C. § 4852d, in support of their claim that the rental business is closely regulated. However, these regulations do not 'establish a comprehensive scheme of regulation' that distinguishes the residential rental business from numerous other businesses or industries. *Patel*, 135 U.S. at 2455. As the Supreme Court has warned, to classify the rental business as closely regulated 'would permit what has always been a narrow exception to swallow the rule.' *See id., Barlow's Inc.*, 436 U.S. at 313. Accordingly, the exception does not render the warrantless inspections authorized by the Code reasonable under the Fourth Amendment.

Id. at *5.

Two New York State cases, applying federal constitutional law, reached the same conclusions, on nearly identical facts (challenges to local ordinances in New York that were similar to the Baker ordinance). See Sokolov v. Village of Freeport, 52 N.Y2d 341, 346 n.1 (1981)("Nor may it be said that the business of residential

rental is of such a nature that consent to a warrantless administrative search may be implied from the choice of the appellants to engage in this business"); ATM One LLC v. Incorporated Village of Hemptstead, 91 A.D.3d 585 (2d Dep't 2012).

Upon information and belief, no case (other than the District Court's decision below) has held that the rental of residential premises is a "closely-regulated" business within the meaning of the administrative search exception. The District Court did not cite any such authority, nor did it discuss New York's landlord-tenant laws to express any rationale for finding the residential rental industry to be "closely-regulated." (A635.) Instead the District Court cited three other federal trial court decisions finding that miscellaneous *other* industries were "closely-regulated." (*Id.*) Those cases are not instructive.

One of the cases cited by the District Court, Routhier v. Goggins, 229 F. Supp. 3d 299 (D. Vt. 2017), held that the *alcohol sales* industry was closely-regulated. But that is hardly novel, since the Supreme Court reached the same conclusion about alcohol distribution in Colonnade Catering, *supra*. In Patel the Supreme Court mentioned Colonnade Catering and cited alcohol sales as one of those rare industries that is actually, "closely-regulated," to draw a contrast hotel operations, which do not meet the "closely-regulated" threshold. Patel, 576 U.S. at 424. As discussed above, the laws applicable to residential landlords in New York are garden-variety

conduct-prescriptive laws (do this, do not do that), they are not a comprehensive regulatory scheme requiring licenses, qualifications, inspections, etc.

Another case relied on by the District Court, GEM Financial Service v. City of New York, 298 F. Supp.3d 464 (E.D.N.Y. 2018), treated pawn brokers as "closely-regulated," but only because the defendant conceded, and did not argue the point, in that litigation: "Both parties agree that pawn brokers and second-hand dealers are closely or pervasively regulated in New York." Id. 495-96. Thus, there is no real analysis of the "closely-regulated business" test in that case.

The District Court also relied on Players v. City of New York, 371 F.Supp.2d 522 (S.D.N.Y. 2005), which held that restaurants are "closely-regulated" businesses within the meaning of the exception. However, as in GEM Financial, the court did not substantively discuss the "closely-regulated" threshold because the defendant conceded the point: "…[A]s Players does not contest, the food industry is a quintessential example of an industry that is 'closely regulated.'" Players, 371 F. Supp.2d at 537. Furthermore, Players pre-dates Patel by ten years, and thus lacked the guidance of its admonition that the "closely-regulated" exception must be "narrowly" applied or else it would "swallow the rule." Patel, 576 U.S. at 425. On top of that, Players errantly cites a prior case from the Seventh Circuit as support for the premise that restaurants are "closely-regulated," but the Seventh Circuit case did not actually recite any analysis for that bare conclusion. Another case, Sweet Sage

Café v. Town of North Redington Beach, Florida, 380 F. Supp. 3d 1209 (M.D. Fla. 2019), has aptly criticized Players for these reasons:

> [C]aselaw is instructive, beginning with *Patel*. Regulations require 'hotels to, inter alia, maintain a license, collect taxes, conspicuously post their rates, and meet certain sanitary standards.' *Patel*, 135 S.Ct. at 2455. The same—and not much more—can be said of restaurants. [Citations omitted] And as feared by the Court in *Patel*, finding that a restaurant, or more broadly an establishment that sells food, is part of a closely-regulated industry would allow the exception to swallow the rule. *Id.* at 2454-55. Another common trait among [the government's restaurant cases] is their reliance on *Contreras v. City of Chicago*, 119 F.3d 1286 (7th Cir. 1997), but the appellate court there did not directly address the district court's finding that restaurants operate in a closely-regulated industry. 119 F.3d at 1290.

Sweet Sage Café, 380 F. Supp. 3d at 1228.

The conservative, narrow application of the exception called for in the Supreme Court's Patel decision, and the holdings that the closely-regulated exception is inapplicable to residential rentals in Baker, 2015 WL 5822659, Sokolov, 52 N.Y2d 341and ATM One, 91 A.D.3d 585 are the best authority at hand, and strongly endorse the conclusion that the residential rental industry does not fall within the "closely-regulated business exception."

## 2. Even if the Exception Were Applicable, the Statute Does Not Satisfy the Exception's Reduced Test.

Even as to "closely-regulated" businesses, the Fourth Amendment imposes some boundaries on administrative searches. In the "closely-regulated" sphere, the

government must satisfy the following requirements: (1) there must be a "substantial' government interest" that informs the regulatory scheme pursuant to which the inspection is made; (2) the warrantless inspection must be "necessary to further [the] regulatory scheme"; and (3) the statute's inspection program, in terms of the certainty and regularity of its application, "[must] provid[e] a constitutionally adequate substitute for a warrant." Patel, 576 U.S. at 426.

Appellants will assume for discussion, without conceding, that the State has a substantial government interest in "the regulatory scheme." That is, the government arguably has an interest in what the ETPA, *generally*, is trying to accomplish—a framework for allowing localities with *bona fide* housing emergencies to deviate from the normal policy of free bargaining to regulated rent, while the emergency exists. But ETPA §8623 clearly does not satisfy the second and third requirements.

First, the inspection authorized by §8623(d), without a warrant or an opportunity for pre-compliance review, is not "***necessary*** to further the regulatory scheme." Patel, 576 U.S. at 426. Under the ETPA, the declaration of emergency depends on one metric and one metric only: whether the locality's vacancy rate of surveyed housing 5% or less. ETPA §8623(a). The "necessary" information, therefore, is simply this: (i) how many units are in the surveyed properties; (ii) how many of those units are occupied on the survey date; and (iii) how many of those units are vacant and available for rent on the survey date. But the statute goes

needlessly beyond that, authorizing the locality to demand such miscellanea as *"relevant information, including but not limited to"*:

- Rent roll records for the *preceding 36 months*, including

- The tenants' names and addresses, and

- The amounts charged to those tenants for rent on a weekly, monthly or annual basis.

Id. §8623(d). A 36 month deep dive on the rental terms and personal information of tenants is not "necessary" to determine what the vacancy rate is today. The District Court offered no valid justification of this prying creep beyond the question at hand. In a footnote the court murmured that the information may be "necessary for municipalities to verify that the information is correct." (A636.) But how, exactly, does an audit of rent rolls from 36 months ago help verify the current vacancies? How does a review of three years' worth of rental charges verify the current vacancy? How do the name and addresses of tenants from three years ago help verify the current vacancy? The answer is, they do not.

Furthermore, as to the second requirement, the ETPA does not "provid[e] a constitutionally adequate substitute for a warrant." Patel, 576 U.S. at 426. The statute offers nothing like a warrant requirement. As noted, the statute authorizes searches for purported "relevant information … including but not limited to" the enumerated items. There is no guardrail on the locality in determining what is

relevant. The locality or its "designees" promulgate the search themselves, and they answer to no one. The statute does not require them to obtain approval from HCR or any other authority. It allows the locality to impose a summary civil penalty of $500 for non-compliance (without having to go to court) and to summarily treat the landlord as having zero vacancies. In other words, the locality is both inspector and judge. That is offensive to the Fourth Amendment.

Moreover, the District Court's reasoning on this point leaves much to be desired. The District Court opined that the purpose of a warrant is "to advise the owner of the scope and objects of the search," and the statute purportedly satisfies this because it "explicitly outlines what records" can be requested. (A636.) That is a substantial oversimplification of the purpose of a warrant. A warrant's purpose is not *merely* notice to the search target, it is also to ensure that the government's intended search is reasonable and with lawful basis, and subject to the judgment of a neutral arbiter. The Fourth Amendment itself states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation []." The point of that is to ensure that government officers do not overreach. If the warrant requirement were solely about giving the target notice of what is to be searched, investigators could write their own warrants, and search and seizure law as we know it would look very different.

## POINT II

### ETPA §8623(f) IS FACIALLY NULL AND VOID BECAUSE IT OFFENDS DUE PROCESS RIGHTS GUARANTEED BY THE FOURTEENTH AMENDMENT.

The Constitution guarantees that no State shall "deprive any person of life, liberty or property without due process of law." U.S. Const. Amend. XIV. Thus, "[d]ue process requires that a deprivation of property be preceded by notice that is 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action' and an 'opportunity for hearing appropriate to the nature of the case.'" Brody v. Village of Port Chester, 434 F.3d 121n 127 (2d Cir. 2005), *quoting* Mullane v. Central Hanover Bank & Trust, 339 U.S. 306, 314 (1950). *See also* Spinelli v. City of New York, 579 F.3d 160, 169-70 (2d Cir. 2009)("The touchstone of due process … is 'the requirement that a person in jeopardy of serious loss (be given) notice of the case against him and an opportunity to meet it.").

The Respondents did not dispute the Appellants' affected property interests in the proceedings below. As the District Court observed, "Neither party appears to dispute that the statute implicates Plaintiffs' property interests." (A638.) Indeed, the Plaintiffs and similarly situated landlords are the owners of their rental properties and, accordingly, have protected property interests in those premises. A citizen's property interests in real estate include, among other things, the right to bargain for the conveyance of estates in the land, including leasehold interests—in other words,

renting the premises or portions of it for bargained-for consideration. *See* Headley v. City of Rochester, 272 N.Y. 197, 205 (1936)(a statute violates an individual's property interest if "it prevents such person from doing an act which he desires to do or diminishes the enjoyment or profit which he would otherwise derive from his property"), *citing* Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 345-40 (1936).

Another right inherent in the landowner's property interest in real estate is the right to invite and exclude—that is, to grant permission to persons to visit or occupy the property, or withhold it. Seawall Assocs. v. City of New York, 74 N.Y.2d 92, 101 (1989)("Under the traditional conception of property, the most important of the various rights of an owner is the right of possession, which includes the right to exclude others from occupying or using the space. This right to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights"), *citing* Loretto v. Teleprompter Manhattan CATV, 458 U.S. 419, 435 (1982).

The adoption of ETPA rent stabilization effectively nullifies these rights for the owners of rental properties that are not exempt from the ETPA. With few exceptions, covered landlords are required to perpetually renew leases with their existing tenants at one or two year intervals (which the tenant gets to decide), thereby eviscerating the "right of possession" and/or "right to exclude." ETPA §8630(a); 9

NYCRR §2503.5, 2504.1 and 2504.2. Moreover, the rental rates become non-negotiable and regulated, thereby depriving the owner of its right to bargain for the terms of the lease. ETPA §8624(b), §8626 and §8632-a. Thus, as the Respondents did not dispute below, the statute stands to affect the Appellants' property interests.

The due process problem lay in ETPA §8623(f) which commands, summarily, that "A nonrespondent owner **shall be deemed** to have zero vacancies" (emphasis added). On its face, this language in a State statute purportedly forbids landlords *and localities alike* from investigating the "truth" of how many vacancies a non-responding landlord actually has, through follow-up in inquires (like phone calls or second notices to the nonresponding landlord). Indeed, the statute does not say that a locality "may" deem a nonresponding landlord to have zero vacancies, or that a locality "may, after conducting a reasonable inquiry," deem a nonresponding landlord to have zero vacancies. The statutory language purports to be an edict that a nonresponding landlord "shall be deemed" to have zero vacancies, period. There is no opportunity to be heard or to challenge that summary determination.

Under this scheme, just a few ETPA-eligible landlords' failure to respond to a survey, or even one such landlord's failure to respond, can have devastating effects on the property rights of all other ETPA-eligible landlords in the locality. If the non-responding landlords' number of actual vacancies is mathematically significant enough, the exclusion of those vacancies from the calculus, by itself, will subject the

entire community of covered landlords to the strictures of ETPA rent stabilization (*i.e.*, regulated rent, mandatory lease renewals, etc.).  For example, as referenced above, in the City of Newburgh the omission of 13 vacancies in a market with 738 purported total units was enough to make the difference between a 5.6% vacancy rate and a 3.9% vacancy rate.  (See pg. 9, *supra*.)

Before the adoption of ETPA §8623(f)'s mandatory-zero treatment of nonresponding landlords, New York State courts applied a less rigid standard in reviewing localities' ETPA declarations: the locality was required to conduct a "good faith study based on precise data."  Colonial Arms Apartments v. Village of Mount Kisco, 104 A.D.2d 964, 965 (2d Dep't 1984), *quoting* Spring Valley Gardens Assocs. v. Marrero, 100 A.D.2d 93 (2d Dep't 1984).

In Spring Valley, a number of landlords refused to answer the town's vacancy survey.  But in that case, the town did not summarily determine all of those landlords to have 0 vacancies.  Rather, "The owners of the nonresponding [properties] were given a second opportunity after their refusal … to respond to a newly-send questionnaire." Id. at 100.  When those landlords continued to refuse, the town then treated them as having zero vacancies.  In a resulting Article 78 proceeding brought by other landlords, the court concluded that the town's efforts were reasonable under the circumstances because it attempted to get answers more than once and, in that case, the nonresponding landlords' defaults were intentional.  Id. at 101 ("it would

be anomalous to hold that those who refused to co-operate with the statistical study should benefit from their stubborn and studied silence"). Furthermore, importantly, the court noted that *responding* landlords who might be adversely affected by the silence of the nonresponding landlords were not without a remedy:

> If it be argued that the landlords who co-operated should not suffer the consequences of the others, the answer is that it would have been a simple matter for plaintiffs to produce at the trial herein, by subpoena if necessary, the relevant statistics of the 16 noncomplying [properties].

Id.

Critically, however, the new ETPA §8623(f) appears calculated to take away that remedy. Now, the nonresponding landlords' vacancies are *presumed* to be zero immediately, and irrevocably, at the moment of non-response: "A nonrespondent owner **shall** be deemed to have zero vacancies" (emphasis added). The requirement is apparently mandatory on localities, not even offering localities the alternative of seeking to verify vacancies or occupied units through other means. The statute recites no exceptions. It offers other landlords no opportunity contest the zero vacancy rating, or even to rebut it in court (there is nothing in the statute authorizing a court to overturn or re-open the statutorily mandated zero count).

This exposes landlords to an unreasonable risk of false and arbitrary ETPA declarations (and all of the consequences that come from ETPA adoption), and gives them nothing to say about it. It is easy to see the potential for abuse. For example,

in the Village of Nyack, the Village of Nyack Housing Authority (a Village agency that owns rental properties) failed to answer the Village's vacancy study, resulting in a presumptive zero for that organization. (A215-16.) And in the City of Poughkeepsie, the City's survey agent did not deliver its survey form to Plaintiff Levinson until after his response was due. (A229.)

Given the very significant consequences for all covered landlords when an ETPA emergency is declared, the statute's failure to grant any opportunity to contest a zero-vacancy finding as to a non-respondent landlord offends due process.

The District Court waved off these issues for two reasons that are unsustainable.

**A.    The ETPA's Public Hearing Requirement Does not Satisfy Due Process.**

First, the District Court held that due process is satisfied because the ETPA requires the locality to hold a public hearing before declaring a housing emergency. (A638.) That conclusion is misplaced.

A hearing alone does not satisfy due process. Gibson v. Berryhill, 411 U.S. 564 (1973)(plaintiff denied due process because of hearing tribunal's inferable financial interest in proceeding created untenable risk of bias). The hearing must be meaningful, and afford the individual the right to be heard on issues material to the preservation of his/her life, liberty or property interest. "The fundamental requisite of due process of law is the opportunity to be heard." Goldberg v. Kelly, 397 U.S.

254, 267 (1970). The hearing must be conducted "in a meaningful manner," so that the individual is given "an effective opportunity to defend" against the state action by "by presenting his own arguments and evidence." Id. at 267-68. *See also* Kritsky v. McGinnis, 313 F. Supp. 1247, 1250 (N.D.N.Y. 1970). Therefore, a hearing in which a participant is flatly precluded from contesting an issue that may be critical to his/her property interest is not due process.

Here, as noted, ETPA §8623(f) inflexibly provides the locality *must* count non-responders as having zero vacancies. Thus, even if responding landlords attend the public hearing and offer good evidence that their non-responding peers do, in fact have vacancies, the statute, as written, apparently bars the locality from hearing them on that issue. The Appellants would like nothing more than to be wrong about that (and retain the right to contest the issue at a public hearing), but a statute directing that the locality "shall" deem non-responding landlords to have no vacancies induces the locality to shut out discourse on that topic. That is not a hearing given "in a meaningful manner," with "an effective opportunity to defend" against the state action. Goldberg, 397 U.S. at 267-68.

## B. The District Court Erred in its Post-Deprivation Hearing Analysis.

Second, the District Court held that due process is satisfied because, purportedly, responding landlords can still go to court to challenge an emergency declaration and, thus, have a "post-deprivation hearing" opportunity. (A639.) The

Appellants would certainly hope that is true, but the language of ETPA §8623(f) appears calculated to extinguish that opportunity. Here again, the language of the statute is: "A nonrespondent owner shall be deemed to have zero vacancies." Id. That is presented as an unqualified directive to anyone reading it: not only localities conducting vacancy studies, but also courts of law reviewing vacancy study outcomes in Article 78 or similar *mandamus* review proceedings. In other words, the language of the statute can be read as a subject matter bar, putting the question of the non-responding landlords' vacancies beyond judicial review. To date, no New York State Court has been called upon to interpret the statute on that fine point.

The District Court, apparently, optimistically read the statute as having no such preclusive effect: "If Plaintiffs believe that the vacancy rate was incorrectly calculated, they are free to challenge such a calculation in an Article 78 proceeding." (A639.) But as discussed above, that is far from clear, and the authority relied on by the District Court for that proposition is inapposite. Specifically, the District Court cited Chadwick Gardens Assocs. v. City of Newburgh, 2024 WL 1788056 (N.Y. Sup. Ct. 2024), a case with which Appellants' counsel is intimately familiar—the undersigned represented the successful landlord challengers in the Chadwick Gardens case. The District Court held Chadwick Gardens out as an example that judicial review of ETPA emergency declarations is alive and well, but the District Court overlooked two critical distinctions between that case and this case.

First, in Chadwick Gardens, the Newburgh vacancy study at issue was completed in November 2023, before ETPA §8623(f) was even adopted in December 2023. Thus, Newburgh did not rely on, and could not have relied on, that provision's presumption of zero vacancies.

Second, for that very reason, Chadwick Gardens did not *involve or address* the practice of deeming non-responding landlords as having zero vacancies. On the contrary, in Chadwick Gardens the fact pattern was quite different: the City of Newburgh neglected to count 13 vacancies that *responding landlords* had *actually reported*. 2024 WL 1788056, at *2 ("The Court finds that there is a sufficiently clear likelihood that the City had irrationally, arbitrarily and/or capriciously failed or refused to account for certain vacancies in its Vacancy Study, *which were indicated on certain property owners' vacancy survey response forms* and, in some instances, further explained to the City Planner prior to the City's Resolution declaring an emergency under the ETPA" [emphasis added].) Essentially, in Chadwick Gardens, the city offered irrational, half-baked reasons for doubting some of the vacancies, and offered no excuses at all for other vacancies, and so the court annulled the vacancy rate calculation as arbitrary and capricious. Certainly that form of judicial review is available, but since Chardwick Gardens did not involve ETPA §8623(f) or the practice of deeming non-responding landlords to have zero vacancies, the case teaches nothing about the constitutionality of ETPA §8623(f).

The District Court dismissed this as "a distinction without a difference." (A640.) That conclusion is difficult to fathom. The very issue that is drawn in sharp relief in the instant case is whether ETPA §8623(f), as written, bars localities and even courts of law from considering evidence and making fact findings as to the "actual vacancies" of landlords who fail to respond to an ETPA vacancy survey. Chardwick Gardens, definitively, was solely about landlords who *did respond* to a vacancy survey, and did not touch the separate issue of reviewing the vacancies of non-responding landlords. Appellants respectfully submit that the distinction could not be clearer, despite the District Court's failure to grasp it.

Finally, the District Court also suggests that landlords have yet another remedy because ETPA rent stabilization only subsists while the housing emergency exists. ETPA §8623(b)(" The emergency must be declared at an end once the vacancy rate described in subdivision a of this section exceeds five percent"). (A640.) The suggestion appears to be that at "any time" landlords could petition to have the emergency declared at an end because the vacancy rate has risen to above 5%.

That is not a post-deprivation remedy. The possibility that circumstances may change months or years later and that the vacancy rate may change does not offer any meaningful relief to landlords who are cast into ETPA rent regulation for months or (more likely) years as a result of a defective vacancy rate calculation (such as a

calculation that summarily negates actual vacancies by non-responding landlords and precludes review). That is akin to suggesting that due process would tolerate the imposition of a penalty or sentence without a trial or hearing, because the defendant could theoretically petition for habeas corpus, or move to reargue later. An ETPA emergency that does not last forever is still an interference with landlords' property interests.

## **CONCLUSION**

For the foregoing reasons, the Orders and Judgment of the District Court must be reversed, the Amended Complaint must be reinstated, and this matter must be remanded to the District Court for further proceedings.

Dated: Schenectady, New York
      August 23, 2024

                        Respectfully submitted,

                        HACKER MURPHY LLP

                        By: Benjamin F. Neidl
                        *Attorneys for the Plaintiffs-Appellants*
                        200 Harborside Drive, Suite 300
                        Schenectady, N.Y.  12305
                        (518) 274-5820
                        Email: Bneidl@hackermurphy.com

## CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENT

This brief complies with the type-volume limitation of Fed. R. App. 32(e) and Local Rule 32.1(4)(a) because this brief contains 12,119 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using the 2013 version of Microsoft Word in 14-point Times New Roman font.

Dated: Schenectady, New York
August 23, 2024

Respectfully submitted,

HACKER MURPHY LLP

_____
By: Benjamin F. Neidl
*Attorneys for the Plaintiffs-Appellants*

**SPECIAL APPENDIX**

### Table of Contents

**Page**

Memorandum-Decision and Order of the Honorable
  Lawrence E. Kahn, dated May 28, 2024........................................  SPA1

Memorandum-Decision and Order of the Honorable
  Lawrence E. Kahn, dated June 10, 2024......................................  SPA19

Judgment of the United States District Court, Northern District
  of New York, entered June 21, 2024............................................  SPA23

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

HUDSON SHORE ASSOCIATES LIMITED
PARTNERSHIP, *et al.*,

                            Plaintiff,

        -against-                                    1:24-CV-370 (LEK/MJK)

THE STATE OF NEW YORK, *et al.*,

                            Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

        On March 18, 2024, Hudson Shore Associates Limited Partnership ("Hudson Shore"),

Haven on the Hudson LLC ("Haven"), Kenneth Levinson ("Levinson"), and Hudson Valley

Property Owners Association ("HVPOA") (collectively, "Plaintiffs"), brought this action against

the State of New York, the New York State Division of Housing and Community Renewal

("HCR"), the Village of Nyack ("Nyack"), and the City of Poughkeepsie ("Poughkeepsie"). Dkt.

No. 1 ("Complaint"). Plaintiffs seek a declaratory judgment finding that a state statute is facially

unconstitutional. See id. ¶ 1. Plaintiffs now move for a preliminary injunction, requesting that the

Court enjoin Defendants from utilizing and enforcing certain subdivisions of the state law. Dkt.

No. 6-2 ("Motion"). The State of New York and HCR (collectively, "State Defendants") have

filed a response, Dkt. No. 22[1] ("Response"), and Plaintiffs have filed a reply, Dkt. No. 31

("Reply").

_____

[1] The State Defendants have also included a motion to dismiss in their Response. See Resp. at
29–30; see also Dkt. No. 24. Poughkeepsie and Nyack have similarly filed motions to dismiss.
Dkt. Nos. 26, 28. The Court will rule on the merits of those motions in a separate Memorandum-
Decision and Order once briefing is complete.

For the reasons that follow, Plaintiffs' Motion is denied.

## II.   BACKGROUND

The following facts are taken from Plaintiffs' Complaint and Motion.

### A.  Allegations in the Complaint

Hudson Shore and Haven are companies, and Levinson is an individual, who own residential apartment units in Nyack and Poughkeepsie. See Compl. ¶¶ 6–8. HVPOA is a not-for-profit corporation that "operates as an association of landlords of real property throughout the Hudson Valley in New York State." Id. ¶ 9.

#### i.       The Emergency Tenant Protection Act

This action concerns New York's Emergency Tenant Protection Act ("ETPA")—specifically N.Y. Unconsol. Law § 8623(d)–(f). See id. ¶¶ 1, 18. In 2019, New York State amended the ETPA "to allow any municipality in New York State to declare a 'housing emergency' under certain circumstances, and opt into the ETPA rent stabilization program to mitigate the rent inflation purportedly caused by such emergencies." Id. ¶ 20. According to the Complaint, this essentially means that "a locality can declare a 'housing emergency' under the ETPA if it conducts a study and determines that its vacancy rate in any class of covered housing accommodation is 5% or less." Id. ¶ 21 (citing Section 8623(a)). The law further specifies that "[t]he emergency 'must be declared at an end' if and when the vacancy rate exceeds 5%." Id. (quoting Section 8623(b)).

HCR oversees local ETPA rent stabilization programs and works with localities to establish local "Rent Guidelines Board[s]." Id. ¶ 22. These boards are "responsible for setting rent caps—dollar limits on the amount of rent a landlord can charge, unless the landlord receives a variance from HCR." Id. (citing Sections 8624, 8623). Plaintiffs further aver that "in

communities with ETPA rent stabilization, covered landlords are generally required to perpetually renew their leases with tenants as long as the tenant is paying the regulated rent, or not committing illegal or nuisance behaviors at the property." Id. ¶ 23 (citing N.Y. Unconsol. Law § 8630 and N.Y. Comp. Codes R. & Regs. tit. 9, §§ 2504.1, 2504.2).

In 2023, New York State again amended the ETPA by adding several subdivisions to Section 8623. See id. ¶ 24. Section 8623 "sets fort[h] the criteria for a locality's declaration of emergency—namely, verifying that the vacancy rate for one or more classes of housing accommodation is less than 5%." Id. ¶ 25. Prior to the 2023 Amendments, Plaintiffs aver that those localities conducting vacancy studies did "so by conducting surveys of landlords within the municipality," such as sending questionnaires to landlords. Id. ¶ 26. Yet the 2023 amendments now require "landlords to disclose more material when a locality conducts its vacancy study." Id. ¶ 27. As amended, Section 8623(d) specifically states:

> When requested by a municipality or a designee, as a part of a study to determine its vacancy rate, *owners . . . shall provide the most recent records of rent rolls and, if available, records for the preceding thirty-six months*. Such *records shall include* the tenant's *relevant information* relating to finding the vacancy rate of such municipality *including but not limited to the name, address, and amount paid or charged on a weekly, monthly, or annual basis for each occupied housing accommodation* and which housing accommodations are vacant at the time of the survey and available for rent. Such records shall also include any housing accommodations that are vacant and not available for rent and provide the reason why such unit is not available for rent.

Id. (citing to Section 8623(d)) (emphasis in the Complaint).

The Complaint avers that Section 8623(d) "is not satisfied to have the landlord report the number of units and the number of vacancies . . . but also to keep and turn over business records for inspection." Id. ¶ 28. Furthermore, the Complaint states that Section 8623(d)'s "including but not limited to" language gives localities the authority "to request other tenant information that it

3

deems 'relevant,' beyond the name, address and rental amount paid by the tenant." Id. ¶ 29.

Section 8623(d) does not require a locality to obtain a warrant nor does it "grant the property

owner any opportunity for pre-compliance review of the locality's demand for records or

information, by a neutral third party or tribunal." Id. ¶¶ 30–31.

Section 8623(e) provides a mechanism to penalize non-compliant landlords. Specifically,

the statute states:

> A municipality may impose a civil penalty or fee of up to five
> hundred dollars on an owner or their agent if the owner or their agent
> refuses to participate in such vacancy survey and cooperate with the
> municipality or a designee in such vacancy survey, or submits
> knowingly and intentionally false vacancy information.

Id. ¶ 32 (quoting Section 8623(e)).

Section 8623(f) concerns those landlords who do not participate in the surveys. The

statute specifically states that "[a] nonrespondent owner shall be deemed to have zero

vacancies." Id. ¶ 33 (quoting Section 8623(f)). According to Plaintiffs, "[t]his means that if a

landlord has vacancies but fails to respond to the survey for any reason, the landlord will be

deemed to have no vacancies." Id. ¶ 34 (emphasis omitted).

Plaintiff avers that "[t]he exclusion of only a few vacancies from a vacancy rate

calculation can make a big difference in determining whether a locality has an ETPA-qualifying

emergency or not." Id. ¶ 35. To demonstrate, Plaintiff notes that the City of Newburgh, New

York recently declared an ETPA emergency based on a vacancy rate of 3.929 percent. See id.

This percentage was calculated by dividing the total number of vacant units for rent (twenty-

nine) by the total units included in the survey (738). See id. Yet Plaintiff notes that since this

survey was conducted, "the owners of four apartment buildings have complained, in litigation,

that Newburgh failed to count 13 vacancies collectively in their buildings." Id. ¶ 36. If those

thirteen vacancies were counted, Plaintiff notes that Newburgh's vacancy rate would exceed five

percent. See id. This demonstrates, according to Plaintiff, that Section 8623(f) creates a situation

in which "just a few landlords' failure, or even one landlord's failure, to respond to a locality's

vacancy survey imposes drastic consequences on all other landlords in the locality who own

property that could be subject to the ETPA, if the locality declares an emergency." Id. ¶ 37.

Furthermore, the ETPA does not give landlords the opportunity to have a hearing on "whether

non-responding landlords do, in fact, have vacancies, and if so how many.". Id. ¶ 38.

      *ii.*     *Actions Taken by Defendants*

According to the Complaint, Nyack conducted two recent ETPA studies, producing one

report in October 2023 and one report in February 2024. See id. ¶¶ 39–40. In the October 2023

report, "Nyack focused only on what were believed to be ETPA-eligible properties with *25 or

more* apartment units." Id. ¶ 39. That study found a vacancy rate of less than five percent. See id.

Yet Nyack ultimately reversed its findings, as "further consideration revealed that the October []

report included a number of properties in the survey that were not ETPA-eligible (because they

were built after 1974)." Id. Nyack then tried to remedy these issues in its February 2024 report,

in which the Town acknowledged the errors of the October 2023 report and expanded the scope

of the study to include "all purportedly ETPA-eligible buildings with 12 or more apartment

units." Id. ¶ 40. The February report found "that the vacancy rate in the 12+ unit subset was

6.115% (not sufficient to institute the ETPA)." Id. Yet Nyack has yet to make "a ruling on

whether to declare an emergency or not, and has indicated in response to criticisms from tenant

groups that it will likely conduct additional studies with modifications to the scope of properties

reviewed." Id.

Nyack's February 2024 study relied on Section 8623. See id. ¶ 41. According to

Plaintiffs, Nyack moved in accordance with Section 8623(d) by requesting landlords provide

SPA6

their "most recent records of rent rolls and, if available, records for the preceding thirty-six months," which included "each tenant's relevant information relating to finding the vacancy rate, including, but not limited to, the name, address, and amount paid or charged on a weekly, monthly or annual basis for each occupied housing accommodation." Id. Nyack also relied on Section 8623(f)'s "presumption that a nonresponsive landlord has zero vacancies." Id. ¶ 43.

Hudson Shore and Haven received Nyack's demands in "early February 2024," and "responses were due by February 29[, 2024]." Id. ¶ 42. Hudson Shore and Haven "provided the demanded information under protest because they had little choice under such a tight time frame—under the statute, they faced interruption of their certificates of occupancy and a summary monetary fine if they did not." Id. Plaintiffs warn that this situation will likely occur again "in the near future, because Nyack has indicated that it plans to do yet more surveys until it reaches a sub-set of covered housing that yields a vacancy rate of 5% or less"—which Nyack is permitted to do under the ETPA. Id.

Plaintiffs aver that Poughkeepsie is also conducting a vacancy survey, and its "methodology also incorporates" Section 8623(f)'s zero vacancy presumption. Id. ¶ 44. Levinson has been served a survey request by the city. See id.

Plaintiffs seek a declaratory judgment finding that Section 8623(d)–(f) are unconstitutional. Specifically, Plaintiffs argue that Section 8623(d)–(e) violates the Fourth Amendment of the United States Constitution, while Section 8623(f) violates the Fourteenth Amendment. See id. ¶¶ 45–72.

**B. The Instant Motion**

Plaintiffs' instant Motion moves for a preliminary injunction that enjoins Defendants from enforcing Section 8623(d)–(f), "except for that portion of subdivision (d) that permits the

locality to inquire how many rental units a property has, and how many units are vacant and

available for rent." Mot. at 24.[2] The Motion's summary of the facts of this case largely mirrors

the Complaint. However, Plaintiff includes one particularly noteworthy new piece of

information: with respect to Levinson, Plaintiff avers that "Poughkeepsie's survey agent did not

deliver him his vacancy survey form until the day after his response deadline, depriving

Levinson a meaningful opportunity to respond to the survey." Id. at 13 (emphasis omitted)

(citing Dkt. No. 9 ¶ 3).

## III.   LEGAL STANDARD

"The fundamental purpose in granting preliminary injunctive relief has always been to

preserve the court's ability to later render a meaningful final decision on the merits by preventing

irreparable harm in the interim." Fairfield Cnty. Med. Ass'n v. United Healthcare of New

England, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), aff'd as modified sub nom. 557 F. App'x 53

(2d Cir. 2014). "It is axiomatic that the contours of an injunction are shaped by the sound

discretion of the trial judge. . . ." Church & Dwight Co. v. SPD Swiss Precision Diagnostics,

GmbH, 843 F.3d 48, 72 (2d Cir. 2016) (quoting Merck Eprova AG v. Gnosis S.p.A., 760 F.3d

247, 265 (2d Cir. 2014)).

"In most cases, a party seeking a preliminary injunction must demonstrate (1) that it will

be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success

on the merits or (b) sufficiently serious questions going to the merits of the case to make them a

fair ground for litigation, and a balance of hardships tipping decidedly in its favor." Forest City

Daly Hous., Inc. v. Town of N. Hempstead, 175 F.3d 144, 149 (2d Cir. 1999). "When ruling on

an application for a preliminary injunction or TRO, the courts have taken into account the

---

[2] Page numbers refer to ECF pagination.

following four factors: (1) the significance of the threat of irreparable harm to the plaintiff if the injunction is not granted; (2) the balance between the movant's alleged harm and the harm that granting the injunction would inflict on the opposing party; (3) the probability that the plaintiff will succeed on the merits; and (4) whether a permanent injunction would disserve the public interest." Fairfield Cnty., 985 F. Supp. 2d at 271.

## IV.   DISCUSSION

The Court declines to grant Plaintiffs' Motion as Plaintiffs have failed to demonstrate either "a likelihood of success on the merits" or that there are "sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor." Forest City Daly Hous, 175 F.3d at 149. This is because Plaintiffs have failed to demonstrate either that (1) Section 8623(d)–(f) violates the Fourth Amendment; or (2) Section 8623(f) violates the Fourteenth Amendment.

### A.  Alleged Fourth Amendment Violations

The Fourth Amendment of the United States Constitution states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The Fourth Amendment further outlines that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). The Supreme Court has specified that "the Fourth Amendment's prohibition against unreasonable searches applies to administrative inspections of private commercial property." Donovan v. Dewey, 452 U.S. 594,

598 (1981). "However, unlike searches of private homes, which generally must be conducted pursuant to a warrant in order to be reasonable under the Fourth Amendment, legislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment." Id.

With respect to their Fourth Amendment position, Plaintiffs argue that execution of the authorities granted under Section 8623(d)–(f) constitutes an illegal search. See Mot. at 14–17. Plaintiffs specifically posit that the statute does not constitute a constitutional "administrative search." Id. An administrative search is a search conducted for reasons other than "crime control" where "special needs make the warrant and probable cause requirement impracticable." Mot. at 15 (quoting City of Los Angeles, Calif. v. Patel, 576 U.S. 409, 420 (2015) (cleaned up)). Plaintiffs argue the challenged sections of the statute are an unconstitutional administrative search because the statute fails to meet the following constitutional guardrails: (1) the subject of an administrative "search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker," id. at 15 (quoting Patel, 576 U.S. at 421); and (2) the subject "must be given an opportunity to 'question the reasonableness of the subpoena, before suffering any penalties for refusing to comply with it,'" id. at 15 (quoting Donovan v. Lone Steer, 464 U.S. 408, 415 (1984)). Plaintiffs argue that the ETPA does not afford a precompliance review, nor does it provide landlords the opportunity to question the reasonableness of the search before suffering a penalty. See Mot. at 15–16.

### i. *Patel* Analogy

Plaintiffs turn the Court's attention to the Supreme Court's Patel decision. In that case, the Supreme Court considered a law in Los Angeles that required hotel operators to record certain information regarding their guests, such as names, addresses, number of people in a party,

vehicle information, rates charged and collected for rooms, and methods of payment. See Patel, 576 U.S. at 412–13. One aspect of the law stated that those records "shall be made available to any officer of the Los Angeles Police Department for inspection, provided that whenever possible, the inspection shall be conducted at a time and in a manner that minimizes any interference with the operation of the business." Id. at 413 (cleaned up). Failure to make these "guest records available for police inspection is a misdemeanor punishable by up to six months in jail and a $1,000 fine." Id. The Supreme Court found that this law was facially invalid because it constituted an unreasonable search, as the law failed to provide precompliance review. See id. at 421. The Court specifically noted:

> A hotel owner who refuses to give an officer access to his or her registry can be arrested on the spot. The Court has held that business owners cannot reasonably be put to this kind of choice. Absent an opportunity for precompliance review, the ordinance creates an intolerable risk that searches authorized by it will exceed statutory limits, or be used as a pretext to harass hotel operators and their guests.

Id.

Plaintiffs argue that the instant case is directly parallel to Patel. Plaintiffs posit that, similar to the Los Angeles ordinance, the ETPA permits wide seizure of information, including "any of 'the tenant's relevant information relating to finding the vacancy rate, including but not limited to' things like the tenant's name, address and rental rates paid." Mot. at 16 (quoting Section 8623(d)) (emphasis omitted). Furthermore, Plaintiffs argue that the landlords who do not comply with the records request face a potential penalty—in this instance, a fine of up to $500.00 and exclusion of one's vacant units from the vacancy rate calculation. See id at 12–13.

Plaintiffs' Patel analogy fails, however, as the ETPA is qualitatively different in several material respects from the law at issue in Patel. The Los Angeles ordinance permitted *any* city police officer to inspect hotel records without warning, and failure to comply could result in a

10

SPA11

hotel owner being "arrested on the spot." Patel, 576 U.S. at 421. The Patel Court focused heavily

on the fact that the threat of criminal prosecution created "an intolerable risk" that police officers

could use the law "as a pretext to harass hotel operators and their guests." See id. The Court

specifically noted that a hotel could be searched "10 times a day, every day, for three months,"

but because of the criminal penalty, could only "refuse to comply with an officer's demand to

turn over the registry at his or her own peril." Id. The ETPA provisions at issue here, by contrast,

are far more circumscribed. Section 8623(d) only permits the municipality or its designees to

review a small subset of information, and Section 8623(e) provides no criminal penalty. That

only a small set of actors—i.e., a municipality and its designees—can request records greatly

reduces the risk landlords could be "harassed" in the manner contemplated in Patel. Additionally,

while the Los Angeles ordinance permitted officers to demand immediate production of

information, the ETPA allows landlords to provide information within a far more generous

timeframe and without the in-person threat of law enforcement. Furthermore, as there is no

criminal penalty, the risk of harassment or abuse is further reduced as compared to the Los

Angeles ordinance, as the coercive power of the state is significantly weaker. Finally, the State

Defendants point out that there are several guardrails included in the ETPA. See Resp. at 18.

Those guardrails from Section 8623 include the following limitations: (1) a municipality or its

designees can only request information if that information is "part of a study to determine"

vacancy rates; (2) a records request can only be made if the records are available; and (3) the

party requesting information must undertake certain privacy precautions, as Section 8623(g)

specifies that "[i]dentifying data or information shall be kept confidential and shall not be shared,

traded, given, or sold to any other entity for any purpose outside of such vacancy study." Such

guardrails were not present in the Los Angeles ordinance, thus further reducing the applicability

of Patel. The Court therefore finds that Patel does not support Plaintiffs' position, as the case is readily distinguishable from the instant matter.

ii.     *Closely Regulated Business Exception*

Turning away from Patel, the Court finds that the "closely regulated business" exception is applicable in this case. That exception finds that the normal Fourth Amendment search protections do not apply to "[c]ertain industries [that] have such a history of government oversight that no reasonable expectation of privacy." Marshall v. Barlow's, Inc., 436 U.S. 307, 313 (1978).

Currently, "[t]here is no clearly defined test used to determine whether a particular business is closely regulated." United States v. Kolokouris, No. 12-CR-6015, 2015 WL 4910636, at *20 (W.D.N.Y. Aug. 14, 2015), report and recommendation adopted, No. 12-CR-6015, 2015 WL 7176364 (W.D.N.Y. Nov. 13, 2015). However, the Supreme Court has noted that businesses that have "a long tradition of close government supervision" are considered closely regulated. New York v. Burger, 482 U.S. 691, 700 (1987). Courts in this Circuit have found wide range of industries constitute closely regulated industries, ranging from pawn brokers to alcohol distributors to restaurants. See Gem Fin. Serv., Inc. v. City of New York, 298 F. Supp. 3d 464, 495 (E.D.N.Y. 2018); Routhier v. Goggins, 229 F. Supp. 3d 299, 304 (D. Vt. 2017); Players, Inc. v. City of New York, 371 F. Supp. 2d 522, 537 (S.D.N.Y. 2005). Given this guidance, the Court finds that the industry of leasing and property management constitutes a closely regulated business. The long history of heavy regulation of this enterprise—especially in the State of New York[3]—necessarily makes this industry closely regulated.

---

[3] See, e.g., Charles K. Gehnrich, Stronger Than Ever: New York's Rent Stabilization System Survives Another Legal Challenge, 90 Fordham L. Rev. 831 (2021); Nicholas Dagen Bloom &

The Supreme Court has specified that even if a business is considered closely regulated, certain searches may become unreasonable if conducted arbitrarily. The Court has therefore enumerated a three-part test regarding laws that concern searches of closely regulated businesses: (1) "there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "the warrantless inspections must be necessary to further the regulatory scheme"; and (3) "the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant." New York v. Burger, 482 U.S. 691, 702–03 (1987) (cleaned up).

The ETPA meets each of the Burger elements. First, there is a "substantial government interest" here, as the ETPA is specifically designed to address a major policy issue: housing availability. The ability of a state's citizens to obtain readily accessible housing is of paramount importance, and regulating such availability is thus of substantial interest to the government. Second, the searches are necessary to further the regulatory scheme, as the records requests are specifically used to determine whether there is a housing shortage in a particular municipality.[4] Finally, the ETPA's provisions provide an adequate substitute for a warrant. The purpose of a warrant is to "advise the owner of the scope and objects of the search, beyond which limits the inspector is not expected to proceed." Marshall, 436 U.S. at 323. Here, Section 8623(d) explicitly outlines what records a municipality or its designee is allowed to request from landlords. Thus, the ETPA satisfies the Supreme Court's three-pronged closely regulated business test.

---

Matthew Gordon Lasner, Affordable Housing in New York: The People, Places, and Policies That Transformed a City (2019).

[4] For example, request for tenant's name and address, and the rental rates paid, are necessary for municipalities to verify that the information provided is correct. Additionally, the fines imposed are necessary to ensure compliance with the regulatory scheme.

# SPA14

*iii.      Reasonableness Standard*

Finally, the Court notes that with respect to searches designed to enforce a regulatory regime, "reasonableness is [] the ultimate standard. If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant." Camara v. Mun. Ct. of City & Cnty. of San Francisco, 387 U.S. 523, 539 (1967). Here, the search authorized by the ETPA is reasonable. The law is designed to deal with the increasingly serious issue of housing availability, and asks landlords to provide a reasonable set of records related to their tenants and units. The records outlined in Section 8623(d) are those that any responsible landlord should be able to access with relative ease, and inspecting these records does not unduly invade on landlords' privacy. On balance, the Court finds the warrantless intrusion authorized by the ETPA reasonable in light of the public interest in housing availability.

Given that the ETPA falls under the closely regulated business exception and meets the Supreme Court's reasonableness standard, the statute does not violate the Fourth Amendment. Accordingly, the Court finds that Plaintiffs are not likely to succeed on the merits of their Fourth Amendment claim and that there are not sufficiently serious questions going to the merits of this claim to make the claim "fair ground[s]" for litigation. Forest City Daly Hous, 175 F.3d at 149.

**B. Alleged Fourteenth Amendment Violations**

When considering whether a party has been deprived of its due process rights under the Fourteenth Amendment, "a court must determine (1) whether a property interest is implicated, and, if it is, (2) what process is due before the plaintiff may be deprived of that interest." Nnebe v. Daus, 644 F.3d 147, 158 (2d Cir. 2011). "Notice and an opportunity to be heard are the hallmarks of due process." Ferreira v. Town of E. Hampton, 56 F. Supp. 3d 211, 225 (E.D.N.Y. 2014).

14

Neither party appears to dispute that the statute implicates Plaintiffs' property interests. See Mot. at 17; Resp. at 13. Thus, the Court must only determine whether the law provides sufficient due process. According to Plaintiffs, Section 8623(f)'s language that "[a] nonrespondent owner shall be deemed to have zero vacancies" is a "summary determination" in which there is "no opportunity to be heard or to challenge" that determination. Mot. at 18–19. Plaintiffs argue that this language "forbids landlords and localities alike from investigating the 'truth' of how many vacancies a non-responding landlord actually has, through follow-up [] inquires." Id. at 18–19 (emphasis omitted). Plaintiffs go on to note that "just a few ETPA-eligible landlords' failure to respond to a survey, or even one such landlord's failure to respond, can have devastating effects on the property rights of all other ETPA-eligible landlords in the locality." Id. at 19. The combination of this effect and the alleged inability to challenge such a determination leads Plaintiffs to the conclusion that "[t]his exposes landlords to an unreasonable risk of false and arbitrary ETPA declarations" and is ripe for potential "abuse." Id. at 20.

Plaintiffs' argument fails on several fronts. First, the ETPA does afford Plaintiffs the opportunity to be heard regarding the calculation of the vacancy rate. Section 8623(c) specifically provides that a municipality may not declare a state of emergency unless a public hearing is held with at least ten-days' notice. This hearing in-and-of-itself provides Plaintiffs with ample opportunity to express their concerns regarding the calculation of the vacancy rate. As the State Defendants correctly point out, see Resp. at 13, courts have found that "where a party has an opportunity to raise claims at a public hearing, there is no denial of procedural or substantive due process." Kaur v. New York State Urb. Dev. Corp., 15 N.Y.3d 235, 261 (2010) (citation omitted). Plaintiffs attempt to argue that this hearing is not sufficient as the language of the statute precludes landlords "from contesting an issue that may be critical to his/her property

15

**SPA16**

interest is not due process." Reply at 7. Plaintiffs argue that because the Section 8623(f)

automatically deems non-respondents as having zero vacancies, landlords are unable to argue in

a hearing that such a zero-vacancy calculation is not reflective of the actual vacancy rate. See id.

Yet Plaintiffs' argument is purely hypothetical. Plaintiffs have provided no example in which a

landlord challenged a vacancy rate calculation at a hearing and a municipality refused to consider

the challenge based on Section 8623(f). There is, in fact, nothing in the language of the statute

that precludes a municipality from adjusting its calculation after hearing new evidence of a

miscalculated rate at the public hearing.

     Second, as the State Defendants correctly note, see Resp. at 14, Plaintiffs have an

opportunity for a post-deprivation hearing. If Plaintiffs believe that the vacancy rate was

incorrectly calculated, they are free to challenge such a calculation in an Article 78 proceeding.

This alone provides sufficient due process. As one court has noted: "[i]n the land-use context,

courts in this Circuit have repeatedly held that the availability of an Article 78 proceeding in

state court is a post-deprivation remedy that satisfies procedural due process." Arizona Hudson

Valley LLC v. Allen, No. 22-CV-1306, 2023 WL 3936640, at *5 (N.D.N.Y. June 9, 2023).

     Finally, Plaintiffs have an additional opportunity outside of the public hearing and Article

78 proceeding to challenge the vacancy calculation. As the State Defendants note, landlords may

"at any time effectuate an end to the rental emergency by proffering to the municipality evidence

that the vacancy rate exceeds 5%." Resp. at 14. To support this argument, the State Defendants

cite to Chadwick Gardens Assocs., LLC v. City of Newburgh, No. EF001874-2024, 2024 WL

1788056 (N.Y. Sup. Ct. 2024). In that case, the City of Newburgh, New York declared a state of

emergency under the ETPA, finding that the vacancy rate equaled 3.93 percent. See id. at *1 The

plaintiffs in that case challenged the vacancy rate calculation, arguing that the determination

"was affected by several errors of an irrational, arbitrary and/or capricious nature, which artificially lowered the vacancy rate below 5.0%." Id. To prove their argument, the plaintiffs provided their own evidence demonstrating that the calculation was inaccurate. See id. at *4–*6. The Chadwick Gardens court ultimately found in favor of the plaintiffs, finding that the plaintiffs' proffered evidence was sufficient to show that the five percent calculation was inaccurate. See id. at *5–*6. Plaintiffs in the instant case argue that Chadwick Gardens is inapplicable because the case does not concern Section 8623(f)'s zero vacancy language. See Reply at 8–9. Yet this is a distinction without a difference. Chadwick Gardens illustrates the basic principle that landlords have the capacity to provide their own data to challenge a vacancy rate calculation, and that independent data may be successfully used to overturn a public housing emergency declaration.

In total, Plaintiffs have three opportunities to challenge a vacancy rate calculation: through a pre-deprivation public hearing pursuant to Section 8623(c), through an Article 78 post-deprivation hearing, or by providing their own calculations. Each of these provides an independent basis for Plaintiffs to have "[n]otice and an opportunity to be heard," thus meeting the requirements for due process. Ferreira, 56 F. Supp. 3d at 225. Plaintiffs are thus unlikely to succeed on the merits of their Fourteenth Amendment claim, nor have they shown that there are sufficiently serious questions going to the merits to make this claim a fair ground for litigation.

As Plaintiffs have not shown that they are likely to succeed on the merits of either of their claims, or that there are sufficiently serious questions regarding those claims, Plaintiffs have failed to meet the Forest City preliminary injunction test. The Court therefore denies Plaintiffs' Motion.

17

**V.      CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that Plaintiffs' Motion, Dkt. No. 6, is **DENIED**; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all

parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      May 28, 2024
            Albany, New York

LAWRENCE E. KAHN
United States District Judge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

HUDSON SHORE ASSOCIATES LIMITED
PARTNERSHIP, *et al.*,

                          Plaintiffs,

      -against-                                    1:24-CV-370 (LEK/MJK)

THE STATE OF NEW YORK, *et al.*,

                          Defendants.

_____

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

      On March 18, 2024, Hudson Shore Associates Limited Partnership, Haven on the Hudson LLC, Kenneth Levinson, and Hudson Valley Property Owners Association (collectively, "Plaintiffs"), brought this action against the State of New York, the New York State Division of Housing and Community Renewal ("HCR"), the Village of Nyack ("Nyack"), and the City of Poughkeepsie ("Poughkeepsie"). Dkt. No. 1 ("Complaint"). Plaintiffs seek a declaratory judgment finding that portions of the Emergency Tenant Protection Act ("ETPA"), N.Y. Unconsol. Law § 8623 (d)–(f), are facially unconstitutional. See id. ¶ 1.

      The State of New York and HCR (collectively, "State Defendants") now move to dismiss the Complaint. Dkt. No. 24-1 ("Motion"). Nyack and Poughkeepsie have also submitted separate motions to dismiss. Dkt. Nos. 26, 28. Plaintiffs have filed responses to the three motions. Dkt. Nos. 32, 33. The State Defendants, Poughkeepsie, and Nyack have filed replies. Dkt. Nos. 35, 36, 37.

      For the reasons that follow, the State Defendants' Motion is granted, and Nyack and Poughkeepsie's motions to dismiss are denied as moot.

**SPA20**

## II.     BACKGROUND

The Court assumes familiarity with the factual background of this case, as detailed in its

prior Memorandum-Decision and Order. Dkt. No. 34 ("May 2024 MDO") at 2–7.

## III.    LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a

"complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that

is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 570 (2007)). A court must accept as true the factual allegations

contained in a complaint and draw all inferences in favor of a plaintiff. See Allaire Corp. v.

Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). A complaint may be dismissed pursuant to Rule

12(b)(6) only where it appears that there are not "enough facts to state a claim to relief that is

plausible on its face." Twombly, 550 U.S. at 570. Plausibility requires "enough fact[s] to raise a

reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Id. at

556.

The plausibility standard "asks for more than a sheer possibility that a defendant has

acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). The Supreme Court

has stated that "the pleading standard Rule 8 announces does not require 'detailed factual

allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me

accusation." Id. (citing Twombly, 550 U.S. at 555). Where a court is unable to infer more than

the mere possibility of the alleged misconduct based on the pleading facts, the pleader has not

demonstrated that she is entitled to relief and the action is subject to dismissal. See id. at 678–79.

### IV.    DISCUSSION

In the May 2024 MDO, the Court considered Plaintiffs' motion for preliminary injunction, Dkt. No. 6-2 ("Preliminary Injunction Motion"). The Court denied the Preliminary Injunction Motion, finding that "Plaintiffs have not shown that they are likely to succeed on the merits of either of their claims, or that there are sufficiently serious questions regarding those claims." May 2024 MDO at 17. In coming to that conclusion, the Court effectively ruled on the merits of Plaintiffs' Complaint. The Court first found that Plaintiffs had not successfully plead that Section 8623(d)–(e) violated the Fourth Amendment because (1) the statute fell under the closely regulated business exception, and (2) the administrative search contemplated by the law was reasonable. See id. 12–14. Second, the Court found that Section 8623(f) does not violate the Fourteenth Amendment because (1) the ETPA affords "Plaintiffs the opportunity to be heard regarding the calculation of the vacancy rate," (2) "Plaintiffs have an opportunity for a post-deprivation hearing," and (3) landlords can challenge the vacancy rate by providing their own vacancy calculations. Id. 14–17.

In moving to dismiss the Complaint, the State Defendants rely on the same arguments used to support their opposition to the Preliminary Injunction Motion.[1] See Mot. at 24–25; Dkt. No. 22 at 24–25. Given that the Court has already found that it agrees with the State Defendants—i.e., that Plaintiffs' constitutional claims fail—the Court grants the Motion and dismisses this action. As the Court is dismissing this action, it does not consider Nyack or Poughkeepsie's motions to dismiss, and accordingly denies those motions as moot.

---

[1] Plaintiffs also rely on the same arguments in their response to the State Defendants' Motion as used in their Preliminary Injunction Motion and the reply to that motion. Compare Dkt. No. 33 at 13–24, with Prelim. Inj. Mot. at 10–17 and Dkt. No. 31 at 4–9.

**V.     CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that the State Defendants' Motion, Dkt. No. 24, is **GRANTED**; and it is further

**ORDERED**, that Poughkeepsie's motion to dismiss, Dkt. No. 26, is **DENIED** as moot; and it is further

**ORDERED**, that Nyack's motion to dismiss, Dkt. No. 28, is **DENIED** as moot; and it is further

**ORDERED**, that the Complaint, Dkt. No. 1, is **DISMISSED**; and it is further

**ORDERED**, that the Clerk is directed to close this action; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      June 10, 2024
            Albany, New York

LAWRENCE E. KAHN
United States District Judge

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

## <u>JUDGMENT IN A CIVIL CASE</u>

**Hudson Shore Associates Limited Partnership,**
**Haven on the Hudson LLC, Kenneth Levinson,**
**Hudson Valley Property Owers Association**

Plaintiff(s)

vs.                          **CASE NUMBER: 1:24-cv-370 (LEK/MJK)**

**The State of New York,**
**The New York State Division of Housing and Community Renewal,**
**The Village of Nyack, City of Poughkeepsie**

Defendant(s)

**Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED that the State Defendants' Motion, Dkt. No. 24, is **GRANTED**; and it is further **ORDERED**, that Poughkeepsie's motion to dismiss, Dkt. No. 26, is **DENIED** as moot; and it is further **ORDERED**, that Nyack's motion to dismiss, Dkt. No. 28, is **DENIED** as moot; and it is further **ORDERED**, that the Complaint, Dkt. No. 1, is **DISMISSED**.

All of the above pursuant to the order of the Honorable **Lawrence E. Kahn**, dated June 10, 2024.

DATED: June 10, 2024

_Clerk of Court_

s/_____
Daniel Krug
Deputy Clerk

# Federal Rules of Appellate Procedure
## Rule 4. Appeal as of Right

**(a) Appeal in a Civil Case.**

1. (1) *Time for Filing a Notice of Appeal.*

(A) In a civil case, except as provided in Rules 4(a)(1)(B), 4(a)(4), and 4(c), the notice of appeal required by Rule 3 must be filed with the district clerk within 30 days after entry of the judgment or order appealed from.

(B) The notice of appeal may be filed by any party within 60 days after entry of the judgment or order appealed from if one of the parties is:

(i) the United States;
(ii) a United States agency;
(iii) a United States officer or employee sued in an official capacity; or
(iv) a current or former United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf — including all instances in which the United States represents that person when the judgment or order is entered or files the appeal for that person.

(C) An appeal from an order granting or denying an application for a writ of error *coram nobis* is an appeal in a civil case for purposes of Rule 4(a).

(2) *Filing Before Entry of Judgment.* A notice of appeal filed after the court announces a decision or order—but before the entry of the judgment or order—is treated as filed on the date of and after the entry.

(3) *Multiple Appeals.* If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later.

(4) *Effect of a Motion on a Notice of Appeal.*

(A) If a party timely files in the district court any of the following motions under the Federal Rules of Civil Procedure, the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion:

(i) for judgment under Rule 50(b);

(ii) to amend or make additional factual findings under Rule 52(b), whether or not granting the motion would alter the judgment;

(iii) for attorney's fees under Rule 54 if the district court extends the time to appeal under Rule 58;

(iv) to alter or amend the judgment under Rule 59;

(v) for a new trial under Rule 59; or

(vi) for relief under Rule 60 if the motion is filed no later than 28 days after the judgment is entered.

(B)(i) If a party files a notice of appeal after the court announces or enters a judgment—but before it disposes of any motion listed in Rule 4(a)(4)(A)—the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered.

(ii) A party intending to challenge an order disposing of any motion listed in Rule 4(a)(4)(A), or a judgment's alteration or amendment upon such a motion, must file a notice of appeal, or an amended notice of appeal—in compliance with Rule 3(c)—within the time prescribed by this Rule measured from the entry of the order disposing of the last such remaining motion.

(5) *Motion for Extension of Time.*

(A) The district court may extend the time to file a notice of appeal if:

(i) a party so moves no later than 30 days after the time prescribed by this Rule 4(a) expires; and

(ii) regardless of whether its motion is filed before or during the 30 days after the time prescribed by this Rule 4(a) expires, that party shows excusable neglect or good cause.

(B) A motion filed before the expiration of the time prescribed in Rule 4(a)(1) or (3) may be ex parte unless the court requires otherwise. If the motion is filed after the expiration of the prescribed time, notice must be given to the other parties in accordance with local rules.

(C) No extension under this Rule 4(a)(5) may exceed 30 days after the prescribed time or 14 days after the date when the order granting the motion is entered, whichever is later.

(6) *Reopening the Time to File an Appeal.* The district court may reopen the time to file an appeal for a period of 14 days after the date when its order to reopen is entered, but only if all the following conditions are satisfied:

(A) the court finds that the moving party did not receive notice under Federal Rule of Civil Procedure 77 (d) of the entry of the judgment or order sought to be appealed within 21 days after entry;

(B) the motion is filed within 180 days after the judgment or order is entered or within 14 days after the moving party receives notice under Federal Rule of Civil Procedure 77 (d) of the entry, whichever is earlier; and

(C) the court finds that no party would be prejudiced.

(7) *Entry Defined.*

(A) A judgment or order is entered for purposes of this Rule 4(a):

(i) if Federal Rule of Civil Procedure 58 (a) does not require a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79 (a); or

(ii) if Federal Rule of Civil Procedure 58 (a) requires a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79(a) and when the earlier of these events occurs:

• the judgment or order is set forth on a separate document, or

• 150 days have run from entry of the judgment or order in the civil docket under Federal Rule of Civil Procedure 79 (a).

(B) A failure to set forth a judgment or order on a separate document when required by Federal Rule of Civil Procedure 58 (a) does not affect the validity of an appeal from that judgment or order.