24-1678-cv
*Hudson Shore et al. v. State of New York et al.*

# In the
# United States Court of Appeals
# For the Second Circuit

————

AUGUST TERM 2024

ARGUED: FEBRUARY 4, 2025
DECIDED: JUNE 2, 2025

No. 24-1678

HUDSON SHORE ASSOCIATES LIMITED PARTNERSHIP, HAVEN ON THE
HUDSON LLC, KENNETH LEVINSON, AND HUDSON VALLEY PROPERTY
OWNERS ASSOCIATION,

*Plaintiffs-Appellants,*

*v.*

STATE OF NEW YORK, NEW YORK STATE DIVISION OF HOUSING AND
COMMUNITY RENEWAL, VILLAGE OF NYACK, NEW YORK, AND CITY OF
POUGHKEEPSIE, NEW YORK,

*Defendants-Appellees.*

————

Appeal from the United States District Court
for the Northern District of New York.

————

Before: WALKER, LEVAL, AND BIANCO, *Circuit Judges.*

————

New York State has contended for decades with a scarcity in
affordable rental housing.  It has deployed varying forms of rent

24-1678-cv

regulation to tackle this problem, most prominently a scheme known as "rent stabilization," which it first adopted in 1974. Rent stabilization caps annual rent increases, aiming to ameliorate the situation in which low vacancy rates empower landlords to raise rents above levels that would be competitive in a market with sufficient supply. For most of its existence, rent stabilization has been available only to New York City and certain other downstate municipalities with particularly tight housing markets.

In 2019, the State amended its rent stabilization law to allow any municipality to regulate rents upon (1) finding a vacancy rate of five percent or less among its rental housing stock; and (2) declaring a housing emergency. To calculate their vacancy rates, local governments sent surveys to landlords requesting rent rolls and other relevant information. These governments were stymied, however, by landlords who ignored their requests or provided false information. In 2023, the Legislature responded by further amending the law to authorize local governments to impose civil penalties on uncooperative landlords and presume from the lack of such cooperation that they have zero vacancies (the "Vacancy Provisions"). N.Y. Unconsol. Law §§ 8623(d)–(f) (McKinney 2025).

Plaintiffs-Appellants are an association of landlords and individual property owners (the "Landlords") in New York's Hudson Valley region who have been surveyed by municipalities conducting vacancy studies. They sued the State, a State housing agency, and two municipalities—Nyack and Poughkeepsie—seeking preliminary and permanent injunctions and a declaratory judgment nullifying the Vacancy Provisions as unconstitutional on their face. The Vacancy Provisions are unconstitutional under the Fourth Amendment, the Landlords allege, because they authorize warrantless searches of their

2

records without providing an opportunity to challenge the searches' scope. They also allege that the Vacancy Provisions violate procedural due process under the Fourteenth Amendment by preventing landlords from contesting local governments' vacancy calculations. The United States District Court for the Northern District of New York (Kahn, *J.*) denied the preliminary injunction and dismissed the complaint for failure to state a claim. The Landlords appealed.

We find that there are sufficient opportunities for landlords to challenge records demands and vacancy calculations to enable the Vacancy Provisions to pass constitutional muster. Specifically, we hold that (1) the Vacancy Provisions are facially valid under the Fourth Amendment because adequate pre-compliance review of the warrantless administrative searches they authorize is available under Article 78 of the New York Civil Practice Law and Rules ("Article 78"); (2) the facial Fourth Amendment challenge to the searches authorized by the Vacancy Provisions also fails because their ample notice and minimal penalties present a low risk of coercion and abuse by municipalities and, thus, the Landlords have failed to plausibly allege that the searches will be unreasonable in every situation; and (3) the Vacancy Provisions do not violate procedural due process because landlords can contest municipalities' vacancy calculations both (a) before rent stabilization is adopted, at public hearings that local governments must hold before declaring a housing emergency; and (b) after rent stabilization is adopted, using Article 78. We therefore AFFIRM the judgment of the district court.

———————

24-1678-cv

BENJAMIN F. NEIDL, Hacker Murphy LLP, Schenectady, NY, *for Plaintiffs-Appellants Hudson Shore Associates Limited Partnership, Haven on the Hudson LLC, Kenneth Levinson, and Hudson Valley Property Owners Association*.

PATRICK A. WOODS, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Andrea Oser, Deputy Solicitor General, *on the brief*), *for* Letitia James, Attorney General of the State of New York, Albany, NY, *for Defendants-Appellees State of New York and New York State Division of Housing and Community Renewal*.

MARISSA EMBOLA (Brian S. Sokoloff, *on the brief*), Sokoloff Stern LLP, Carle Place, NY, *for Defendant-Appellee Village of Nyack*.

REBECCA A. VALK, City of Poughkeepsie Corporation Counsel, Poughkeepsie, NY, *for Defendant-Appellee City of Poughkeepsie*.

Evan Henley, Edward Josephson, The Legal Aid Society, New York, NY; Marcie Kobak, Legal Services of the Hudson Valley, White Plains, NY, *for amici curiae Community Voices Heard & For the Many*.

————

JOHN M. WALKER, JR., *Circuit Judge*:

New York State has contended for decades with a scarcity in affordable rental housing. It has deployed varying forms of rent regulation to tackle this problem, most prominently a scheme known as "rent stabilization," which it first adopted in 1974. Rent stabilization caps annual rent increases, aiming to ameliorate the

4

24-1678-cv

situation in which low vacancy rates empower landlords to raise rents above levels that would be competitive in a market with sufficient supply. For most of its existence, rent stabilization has been available only to New York City and certain other downstate municipalities with particularly tight housing markets.

In 2019, the State amended its rent stabilization law to allow any municipality to regulate rents upon (1) finding a vacancy rate of five percent or less among its rental housing stock; and (2) declaring a housing emergency. To calculate their vacancy rates, local governments sent surveys to landlords requesting rent rolls and other relevant information. These governments were stymied, however, by landlords who ignored their requests or provided false information. In 2023, the Legislature responded by further amending the law to authorize local governments to impose civil penalties on uncooperative landlords and presume from the lack of such cooperation that they have zero vacancies (the "Vacancy Provisions"). N.Y. Unconsol. Law §§ 8623(d)–(f) (McKinney 2025).

Plaintiffs-Appellants are an association of landlords and individual property owners (the "Landlords") in New York's Hudson Valley region who have been surveyed by municipalities conducting vacancy studies. They sued the State, a State housing agency, and two municipalities—Nyack and Poughkeepsie—seeking preliminary and permanent injunctions and a declaratory judgment nullifying the Vacancy Provisions as unconstitutional on their face. The Vacancy Provisions are unconstitutional under the Fourth Amendment, the Landlords allege, because they authorize warrantless searches of their records without providing an opportunity to challenge the searches' scope. They also allege that the Vacancy Provisions violate procedural due process under the Fourteenth Amendment by

5

24-1678-cv

preventing landlords from contesting local governments' vacancy calculations. The United States District Court for the Northern District of New York (Kahn, *J.*) denied the preliminary injunction and dismissed the complaint for failure to state a claim. The Landlords appealed.

We find that there are sufficient opportunities for landlords to challenge records demands and vacancy calculations to enable the Vacancy Provisions to pass constitutional muster. Specifically, we hold that (1) the Vacancy Provisions are facially valid under the Fourth Amendment because adequate pre-compliance review of the warrantless administrative searches they authorize is available under Article 78 of the New York Civil Practice Law and Rules ("Article 78"); (2) the facial Fourth Amendment challenge to the searches authorized by the Vacancy Provisions also fails because their ample notice and minimal penalties present a low risk of coercion and abuse by municipalities and, thus, the Landlords have failed to plausibly allege that the searches will be unreasonable in every situation; and (3) the Vacancy Provisions do not violate procedural due process because landlords can contest municipalities' vacancy calculations both (a) before rent stabilization is adopted, at public hearings that local governments must hold before declaring a housing emergency; and (b) after rent stabilization is adopted, using Article 78. We therefore AFFIRM the judgment of the district court.

BACKGROUND

## I.    The Emergency Tenant Protection Act

New York has regulated its rental housing market in varying forms for over a century. *See Cmty. Hous. Improvement Program v. City*

24-1678-cv

*of New York*, 59 F.4th 540, 544–47 (2d Cir. 2023) ("*CHIP*") (describing the history of rent regulation in New York). Rent stabilization, the now dominant form of regulation, was first enacted by New York City in 1969. *Id.* at 545; N.Y.C. Admin. Code § 26-503.[1] Since 1974, the process under which municipalities can adopt and re-authorize rent stabilization has been governed by the Emergency Tenant Protection Act ("ETPA"). N.Y. Unconsol. Law §§ 8621–34 (McKinney 2025). For most of this time, however, rent stabilization was available only to New York City and municipalities in Nassau, Rockland, and Westchester counties. 2019 N.Y. Laws ch. 36, Part G § 3.

That changed in 2019. In recognition of a state-wide crisis in the availability and affordability of housing, New York's Legislature amended the ETPA to allow any municipality to opt into stabilization by declaring a housing emergency. 2019 N.Y. Laws ch. 36, Part G § 3 (codified as N.Y. Unconsol. Law § 8634). To declare an emergency, a local government must first determine that the vacancy rate among all or a certain class of its housing units "is not in excess of five percent." N.Y. Unconsol. Law § 8623(a). "The emergency must be declared at an end once the vacancy rate . . . exceeds five percent." *Id.* § 8623(b).

The 2019 law gave municipalities little guidance on how to carry out vacancy studies, however, and the process proved onerous and hotly contested. The New York State Legislature grew concerned that landlords were staving off regulation by refusing to respond to

---

[1] The history of rent stabilization and related legislative history discussed here are matters of public record of which we are entitled to take judicial notice. *See Caha v. United States*, 152 U.S. 211, 222 (1894); *see also Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012) (explaining that courts may take judicial notice of "relevant matters of public record").

7

24-1678-cv

requests for vacancy information or by responding with "deliberately manipulate[d] data."  App'x 284, N.Y. State Sen. Introducer's Mem. in Support of S.B. 2023-S1684A (2023).  And municipalities that were able to complete vacancy studies found their findings tied up in litigation.  *See, e.g.*, *Hudson Valley Prop. Owners Ass'n v. City of Kingston*, 208 N.Y.S.3d 322 (3d Dep't 2024) (upholding Kingston's emergency declaration); *Chadwick Gardens Assocs. v. City of Newburgh*, 208 N.Y.S.3d 487 (N.Y. Sup. Ct. 2024) (unpublished op.) (overturning Newburgh's emergency declaration).

The Legislature responded in 2023 by further amending the ETPA to streamline the vacancy study process by specifying the types of information municipalities can demand from landlords and giving them tools to complete studies expeditiously.  2023 N.Y. Laws ch. 698, § 1 (codified as N.Y. Unconsol. Law §§ 8623(d)–(g)).  The Landlords' claims in this case center on three of these additions, §§ 8623(d)–(f) (the "Vacancy Provisions"), reproduced as follows.

First, § 8623(d) (the "Response Provision") imposes a duty on landlords to accurately respond to requests for information.  Upon receiving a request from a local government, owners "shall provide the most recent records of rent rolls and, if available, records for the preceding thirty-six months," including

> the tenant's relevant information relating to finding the vacancy rate of such municipality including but not limited to the name, address, and amount paid or charged on a weekly, monthly, or annual basis for each occupied housing accommodation and which housing accommodations are vacant at the time of the survey and available for rent.  Such records shall also include any housing accommodations that are vacant and not

8

24-1678-cv

> available for rent and provide the reason why such unit
> is not available for rent.

N.Y. Unconsol. Law § 8623(d).

Second, § 8623(e) (the "Penalty Provision") provides that municipalities "may impose a civil penalty or fee of up to five hundred dollars" on landlords who "refuse[] to participate in [a] vacancy survey" or "submit[] knowingly and intentionally false vacancy information." *Id.* § 8623(e).

Finally, § 8623(f) (the "Adverse Inference Provision") provides that "[a] nonrespondent owner shall be deemed to have zero vacancies." *Id.* § 8623(f).

Two other subsections, not challenged by the Landlords, are relevant to evaluating those that are: (1) § 8623(g) (the "Confidentiality Provision") requires that "[i]dentifying data or information" obtained during a vacancy study "shall be kept confidential and shall not be shared, traded, given, or sold to any other entity for any purpose outside of such vacancy study"; and (2) § 8623(c) (the "Hearing Provision") requires that municipalities conduct a "public hearing held on not less than ten days public notice" before opting to declare an emergency. *Id.* §§ 8623(c), (g).

## II.   Procedural History

After local governments embarked on new vacancy studies under the 2023 amendments, landlords responded with more lawsuits. Plaintiffs-Appellants here consist of property owners in Nyack and Poughkeepsie who received vacancy surveys and the Hudson Valley Property Owners Association (collectively, the "Landlords"). They brought this action on March 18, 2024 against

9

24-1678-cv

Defendants-Appellees State of New York, New York Division of Housing and Community Renewal (together, the "State"), Poughkeepsie, and Nyack, seeking, among other things, a declaration voiding the Vacancy Provisions as unconstitutional. In doing so, they join a tradition almost as old as rent regulation in New York itself: suing to invalidate it under various provisions of the federal Constitution. *CHIP*, 59 F.4th at 547 (listing failed challenges under the Takings Clause, the Contracts Clause, the Equal Protection Clause, and substantive and procedural due process). The Landlords' claims here allege unlawful searches of landlords' books under the Fourth Amendment and deprivation of their property interest without due process under the Fourteenth Amendment.

The Landlords allege that the Response and Penalty Provisions facially violate the Fourth Amendment by authorizing warrantless searches of landlords' books without providing an opportunity to obtain review of the searches' reasonableness. Their due process claim, meanwhile, alleges that the Adverse Inference Provision prevents them from contesting a locality's vacancy rate calculation to the extent that it relies on zero-vacancy inferences drawn against nonresponsive landlords. The Landlords also asserted as-applied constitutional claims, but abandon them on appeal.

On March 25, 2024, the Landlords moved for a preliminary injunction to prevent the enforcement of the Vacancy Provisions against them. The State, Nyack, and Poughkeepsie each filed separate motions to dismiss.

On May 28, 2024, the district court denied the Landlords' preliminary injunction motion, holding that their claims were unlikely to succeed on the merits because they failed as a matter of

24-1678-cv

law. *Hudson Shore Assocs. v. New York*, No. 1:24-CV-370, 2024 WL 3212689, at *4–8 (N.D.N.Y. May 28, 2024) ("*Hudson Shore I*"). On June 10, 2024, the district court granted the State's motion to dismiss under Rule 12(b)(6), relying on the reasoning from its May 28 order, and denied Nyack and Poughkeepsie's motions to dismiss as moot. *See Hudson Shore Assocs. v. New York*, No. 1:24-CV-370, 2024 WL 2923703, at *1–2 (N.D.N.Y. June 10, 2024) ("*Hudson Shore II*").

## DISCUSSION

On appeal, the Landlords challenge the district court's denial of their motion for a preliminary injunction and its dismissal of their facial constitutional claims. We review its denial of a preliminary injunction for abuse of discretion and the legal conclusions underlying that decision de novo. *JLM Couture, Inc. v. Gutman*, 91 F.4th 91, 99 (2d Cir. 2024). The district court's dismissal of the Landlords' Amended Complaint for failure to state a claim also gets de novo review. *CHIP*, 59 F.4th at 548. We may affirm either decision on any ground supported by the record. *Olson v. Major League Baseball*, 29 F.4th 59, 84 (2d Cir. 2022) (Rule 12(b)(6) dismissal); *Gazzola v. Hochul*, 88 F.4th 186, 195 (2d Cir. 2023) (per curiam) (denial of a preliminary injunction).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Gazzola*, 88 F.4th at 194.[2] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true,

---

[2] Unless otherwise indicated, in quoting cases, all internal quotation marks and citations are omitted, and all alterations are adopted.

11

24-1678-cv

to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). We "draw[] all reasonable inferences in [the Landlords'] favor" while undertaking this analysis. *Singh v. Deloitte LLP*, 123 F.4th 88, 93 (2d Cir. 2024). Because the district court's denial of the Landlords' motion for a preliminary injunction and its dismissal of their Amended Complaint each rested on its holding that their claims failed as a matter of law, our review of these decisions merges into the question of whether the Landlords' claims are legally viable. *Hudson Shore I*, 2024 WL 3212689, at *4–8; *Hudson Shore II*, 2024 WL 2923703, at *1–2.

The Landlords' challenges to the Vacancy Provisions are facial: they "attack [the] statute itself as opposed to a particular application." *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015). Facial challenges "often rest on speculation" about laws' coverage and enforcement, risking the "premature interpretation of statutes on the basis of factually barebones records." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). They also offend "the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id*. Finally, they can "short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).

Accordingly, the Supreme Court has made facial claims "the most difficult challenge to mount successfully." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Claimants must "establish[] that no set of circumstances exists under which the [a]ct would be valid, *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State*

24-1678-cv

*Grange*, 552 U.S. at 449 (alteration in original omitted).  In weighing these claims, we look only to the bare "facial requirements" of the statute at issue and decline invitations to "speculate about" improbable "imaginary cases."  *Id.* at 450.  We also "take pains to give a statute a limiting construction in order to avoid a constitutional difficulty," *Allstate Ins. Co. v. Serio*, 261 F.3d 143, 150 (2d Cir. 2001), favoring a constitutionally sound reading so long as it is not "plainly contrary to the intent of the Legislature," *Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 496 (2d Cir. 2007).

We need not take such pains in disposing of the Landlords' challenges here, which fail under a straightforward reading of the Vacancy Provisions.  As set forth below, we conclude that the facial constitutional challenges fail as a matter of law because the Landlords have failed to plausibly allege that the Vacancy Provisions are unconstitutional "in all [their] applications."  *Patel*, 576 U.S. at 418.

## I.    The Landlords' Fourth Amendment Claim

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "This expectation exists not only with respect to traditional police searches conducted for the gathering of criminal evidence but also with respect to administrative inspections designed to enforce regulatory statutes."  *New York v. Burger*, 482 U.S. 691, 699–700 (1987).  While "reasonableness is . . . the ultimate standard" against which searches are measured under the Fourth Amendment, *Soldal v. Cook Cnty.*, 506 U.S. 56, 71 (1992), the Supreme Court has condemned warrantless searches and those otherwise "conducted outside the judicial

13

24-1678-cv

process" as "*per se* unreasonable subject only to a few specifically established and well-delineated exceptions," *Patel*, 576 U.S. at 419.

This case involves one such exception. No warrant is necessary for "administrative search[es]": those implicating "special needs" that "make the warrant and probable-cause requirement impracticable, and where the primary purpose of the searches is distinguishable from the general interest in crime control." *Id.* at 420. Warrantless administrative searches are permissible so long as their subjects have "an opportunity for precompliance review," that is, an opportunity to challenge the search's reasonableness in front of a "neutral decisionmaker" before "fac[ing] penalties for failing to comply." *Id.* at 419–21. Courts excuse the requirement for precompliance review, however, when the searches in question target an industry that is so "closely regulated" that its participants have "no reasonable expectation of privacy" in their books or inventory. *Id.* at 424. This "narrow exception" has been applied sparingly and comes with its own set of additional requirements. *Id.* at 424–26.

The Supreme Court most recently considered administrative searches in *City of Los Angeles v. Patel*, 576 U.S. 409 (2015). *Patel* concerned a Los Angeles ordinance that required hotels to turn over information about their guests to any police officer who requested access. *Id.* at 412–13. Hotel owners who refused a search could be arrested and charged with a misdemeanor. *Id.* at 413. The Court deemed the ordinance facially unconstitutional on the basis that it authorized warrantless administrative searches for which there was no opportunity for precompliance review. *Id.* at 419–24. Absent this review, the potential for criminal liability created "an intolerable risk that searches authorized by [the ordinance] will exceed statutory

limits, or be used as a pretext to harass hotel operators and their guests." *Id*. at 421.

*Patel* also confirmed that facial challenges to statutes can be brought under the Fourth Amendment. *Id.* at 415. As in other contexts, facial Fourth Amendment claims must show that the challenged law is "unconstitutional in all of its applications." *Id.* at 418; *see CHIP*, 59 F.4th at 549 ("*Patel* . . . only clarified the scope of *Salerno*'s standard for facial challenges. It did not reject or relax the *Salerno* standard.").

In this case, the district court rejected the Landlords' Fourth Amendment claim on three grounds. First, it distinguished the Vacancy Provisions from the law struck down in *Patel*. It found that the Vacancy Provisions posed a lower threat of coercion because they give a "far more generous timeframe" for compliance, do not authorize in-person inspections or criminal liability, cover a narrower set of information, and have guardrails against abuse, such as the Confidentiality Provision. *Hudson Shore I*, 2024 WL 3212689, at *5. Next, the district court held that no precompliance review is necessary because the closely regulated business exception applied. *Id.* at *6. Finally, the district court found that searches authorized by the Vacancy Provisions are reasonable because they serve an important purpose, demand easily accessible records, and do not unduly invade landlords' privacy. *Id.* at *7.

We affirm on the alternate ground that, under Article 78, landlords have adequate opportunity to obtain precompliance review of searches authorized by the Vacancy Provisions, and that they are therefore not per se unreasonable. We also agree that these searches are likely to be less coercive and more reasonable than those

authorized by the *Patel* ordinance and, thus, Landlords have failed to plausibly allege that the searches will be unconstitutional in every application authorized by the Vacancy Provisions. Both conclusions independently require us to reject the Landlords' claims as a matter of law. Because these conclusions are sufficient to dispose of the Landlords' Fourth Amendment claim, we decline to address the district court's holding regarding whether the rental housing industry is eligible for the closely regulated business exception.

### A. Requirement for Precompliance Review Satisfied

The Vacancy Provisions are valid under the Fourth Amendment because they authorize administrative searches for which landlords can obtain precompliance review using Article 78. *See Patel*, 576 U.S. at 420. Although the district court did not reach this issue, we may affirm "on any ground which finds support in the record, regardless of the ground upon which the trial court relied." *Olson*, 29 F.4th at 73.

The Landlords do not contest that the searches authorized by the Vacancy Provisions are "administrative." *Patel*, 576 U.S. at 420. Their purpose, which is to accurately measure the availability of housing and need for regulation, differs starkly "from the general interest in crime control." *Id*. And the "special need[]" to quickly collect data for hundreds or thousands of properties makes it "impracticable" to obtain a warrant for each surveyed landlord. *Id.*

The focus of our inquiry, then, is whether landlords have an adequate opportunity to challenge demands to see their books. They do. The Supreme Court "has never attempted to prescribe the exact form an opportunity for precompliance review must take," but two

requirements are clear: (1) the searched party must be able to question the search's reasonableness in front of "a neutral decisionmaker"; and (2) this review must be available "before [the searched party] faces penalties for failing to comply." *Id.* at 421.  The Supreme Court has repeatedly blessed administrative subpoenas as satisfying these criteria.  *See id.* at 421–23; *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984) (providing that a subpoenaed party in an administrative search proceeding is adequately protected by the opportunity to "question the reasonableness of the subpoena, before suffering any penalties for refusing to comply with it, by raising objections in an action in district court").  Recipients of administrative subpoenas can challenge the scope of their demands in court via a motion to quash before being made to comply.  *Patel*, 576 U.S. at 422–23.

Article 78 provides precompliance review similar to that available from a motion to quash an administrative subpoena. Article 78 actions are "expedited summary procedure[s]" for the "speedy correction of improper action by a body or officer." *Whitfield v. City of New York*, 96 F.4th 504, 520 (2d Cir. 2024).  They offer relief against any administrative action that "was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion."  N.Y. C.P.L.R. § 7803(3).  "[A]n error of law" can be demonstrated by showing that the action was "'contrary to Constitution or statute.'"  *Whitfield*, 96 F.4th at 532 (quoting *Meisner v. Hamilton, Fulton, Montgomery Bd. of Coop. Educ. Servs.*, 108 N.Y.S.3d 206, 209–10 (3d Dep't 2019)). Article 78 affords a range of equitable relief, including orders to cease or reverse the unlawful conduct.  *Id.* at 520.

24-1678-cv

Article 78 meets each of the requirements for precompliance review.  First, it provides access to a neutral decisionmaker: the New York Supreme Court.  N.Y. C.P.L.R. § 7804(b).

Next, Landlords can use Article 78 to challenge the scope of demands under the federal Constitution or state law.  Article 78 has been used for decades to challenge the reasonableness of regulatory searches under the Fourth Amendment, including searches of television and radio repair businesses, *Glenwood TV, Inc. v. Ratner*, 480 N.Y.S.2d 98 (2d Dep't 1984), *aff'd*, 65 N.Y.2d 642 (1985), vehicle scrap yards, *Murtaugh v. N.Y. State Dep't of Env't Conservation*, 841 N.Y.S.2d 189 (4th Dep't 2007), homes, *Yee v. Town of Orangetown*, 904 N.Y.S.2d 88 (2d Dep't 2010), and taxi drivers' GPS data, *Carniol v. N.Y.C. Taxi & Limousine Comm'n*, 975 N.Y.S.2d 842 (Sup. Ct. 2013), *aff'd*, 2 N.Y.S.3d 337 (Mem) (1st Dep't 2015).  The Landlords give no reason why similar Article 78 scrutiny will be unavailable here.

Article 78 can also be used to challenge demands under the ETPA itself.  The Landlords argue otherwise, pointing to the broad discretion that the Response Provision gives local governments.  Because municipalities can demand whatever records they deem "relevant . . . to finding the vacancy rate," they argue, the ETPA provides no legal standard under which a court could disapprove of a search's scope.  N.Y. Unconsol. Law § 8623(d).  But Article 78 allows petitioners to challenge actions not only on the basis that they were "affected by an error of law," but also that they are "arbitrary and capricious" or an "abuse of discretion," however wide that discretion may be.  N.Y. C.P.L.R. § 7083(3).  A landlord can therefore challenge a survey's scope by alleging that the municipality acted arbitrarily or abused its discretion in determining that the requested information would be relevant.

18

Finally, landlords can file an Article 78 petition as soon as a demand for records is made, meaning that review is available before they "fac[e] penalties for failing to comply." *Patel*, 576 U.S. at 421. New York courts have adjudicated Article 78 petitions that were filed before the challenged searches were carried out, or the consequences for refusing the searches were administered. *See Patchogue-Medford Cong. of Tchrs. v. Bd. of Educ. of Patchogue-Medford Union Free Sch. Dist.*, 70 N.Y.2d 57, 63–64 (1987) (adjudicating teachers' Fourth Amendment challenge to employee drug tests, which was filed "[p]rior to the date for the scheduled examination" and before petitioners suffered denial of tenure for refusal to test).

The Landlords argue that review will not be available fast enough because local governments can demand compliance "immediately, or on short notice." Landlords' Br. at 24; *see also* Oral Arg. Audio Recording at 7:10–7:36. It is true that the Vacancy Provisions do not specify a timeline for penalizing noncooperative landlords, making it possible in theory that local governments could demand immediate compliance. But the Landlords do not show that this will happen in practice, let alone in all of the Vacancy Provisions' applications, as is necessary to support their facial challenge. *Wash. State Grange*, 552 U.S. at 449. And the Amended Complaint suggests that municipalities have not demanded immediate compliance from landlords. App'x 20, Amend. Compl. ¶ 42 (alleging that "Plaintiffs . . . received these demands from Nyack in early February 2024 and responses were due by February 29"). This is sufficient time to at least file an Article 78 petition and, in most circumstances, to obtain preliminary relief using Article 78's "expedited summary procedure[s]." *Whitfield*, 96 F.4th at 520. We therefore decline the Landlords' invitation to "speculate about" improbable imaginary

24-1678-cv

situations in which a landlord could be penalized for noncompliance before being able to obtain Article 78 review. *Wash. State Grange*, 552 U.S. at 450.

Article 78 allows landlords to, in at least some circumstances, obtain review before being forced to choose between handing over their books or facing a penalty. That is enough to defeat any facial challenge to the Vacancy Provisions under the Fourth Amendment. *See Patel*, 576 U.S. at 421; *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016) ("There is no categorical bar to mounting a facial challenge under the Fourth Amendment, but, in doing so, Plaintiffs assume a demanding burden—establishing that a law is unconstitutional in all of its applications.").

### B. Contrast from *Patel*

Our holding regarding precompliance review is alone sufficient to dispose of the Landlords' Fourth Amendment claim. *Id.* The "'underlying command of the Fourth Amendment,'" however, "'is always that searches and seizures be reasonable,' and 'what is reasonable depends on the context within which a search takes place.'" *Gudema v. Nassau Cnty.*, 163 F.3d 717, 722 (2d Cir. 1998) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985)). *Patel* reflects this split focus between rigid doctrinal rules relating to the amount of review available to contest a search, discussed at length above, and the factual context in which a search takes place. While its holding relied primarily on the lack of precompliance review, *Patel* also repeatedly emphasized the consequences of a hotel owner's refusal to comply. Because hotel owners faced criminal liability for refusing a search, the lack of precompliance review "alter[ed] the dynamic between the officer and the hotel to be searched" and "create[d] an

20

intolerable risk that searches . . . will exceed statutory limits, or be used as a pretext to harass hotel operators and their guests." *Patel*, 576 U.S. at 421–23.  In view of the Fourth Amendment's focus on searches' factual context, as well as the Landlords' persistent analogies to *Patel*'s facts, we briefly compare the searches at issue here with those authorized by the ordinance condemned in *Patel*.  This comparison further reinforces our holding that searches authorized by the Vacancy Provisions will not be unreasonable in every application.

We agree with the district court that the circumstances here present a significantly lower risk of abuse and coercion than the searches in *Patel*.  First, a civil penalty of up to $500 does not approach the coercive power of criminal liability.  The Supreme Court has long maintained that the need for individualized review is greater where noncompliance comes with the threat of arrest and prosecution.  *See id.* at 421 ("'[B]road statutory safeguards are no substitute for individualized review, particularly when those safeguards may only be invoked at the risk of a criminal penalty.'" (quoting *Camara v. Mun. Ct. of City & Cnty. of S.F.*, 387 U.S. 523, 533 (1967))).

The Landlords suggest that the Adverse Inference Provision, when combined with the $500 penalty, rivals the consequences at stake in *Patel*.  Because municipalities can deem nonresponsive landlords to have zero vacancies and thus lower the overall vacancy rate, the Landlords argue, landlords may feel coerced by the threat that their non-response will lead to rent stabilization.  Of course that is true.  But rent stabilization is not a punishment designed to compel compliance with vacancy surveys; the surveys instead help municipalities decide whether rent stabilization is necessary.  *See Spring Valley Gardens Assocs. v. Marrero*, 474 N.Y.S.2d 311, 315–16 (2d

21

Dep't 1984), *aff'd*, 68 N.Y.2d 627 (1986) (reasoning that "it would be anomalous to hold that those who refused to co-operate with the statistical study should benefit from their stubborn and studied silence"). And rent stabilization is the policy choice of the State Legislature and the municipalities enacting it. To view stabilization chiefly as a punitive means to collect data would misread the ETPA, turn the system on its head, and violate our duty to construe laws "embodying the will of the people . . . in a manner consistent with the Constitution." *Wash. State Grange*, 552 U.S. at 451.

Second, the Landlords do not allege that records demands are made in person; in practice, they are sent remotely via mail, email, or phone. App'x 40–41, Amend. Compl. Ex. D, at 1–2. Landlords are therefore not forced to choose immediately between handing over their books or facing punishment, which was the choice put to hotel owners in *Patel*, 576 U.S. at 421. The Landlords again suggest that municipalities could demand records immediately, but such speculation, without the slightest hint that they would actually do so, cannot sustain a facial challenge. *See Wash. State Grange*, 552 U.S. at 450.

Third, while the searches in *Patel* could be conducted at the momentary whimsy of any passing police officer, searches under the Vacancy Provisions can only occur in limited circumstances that give prior warning. Demands can only be made while local governments are conducting vacancy studies, the commencement of which could warn landlords to expect a survey. *See* N.Y. Unconsol. Law § 8623(d) (allowing municipalities to request vacancy information "as a part of a study to determine [their] vacancy rate"). While the Landlords point out that Nyack undertook two studies in one year, that is a far cry from the ever present possibility of being searched under the *Patel*

ordinance. Relatedly, the Vacancy Provisions allow only municipalities and their "designee[s]" to issue the demands, not any passing police officer, further reducing the risk of abuse. *Id.* § 8623(d).

Finally, the Confidentiality Provision closes off another potential avenue for abuse by keeping landlords' and tenants' information safe from misuse by third parties. *Cf. Patel*, 576 U.S. at 421 (noting risk that searches could be used "as a pretext to harass hotel operators and their guests"). In sum, we agree with the district court that the searches in *Patel* are distinguishable from the searches at issue here, and conclude that searches authorized by the Vacancy Provisions are not unreasonable in every application because their ample notice and minimal penalties presents a low risk of coercion and abuse by municipalities. Thus, the Landlords' facial challenge under the Fourth Amendment fails as a matter of law on this independent ground.

## II.    The Landlords' Procedural Due Process Claim

The Landlords complain that the Adverse Inference Provision amounts to a deprivation of landlords' property without procedural due process in violation of the Fourteenth Amendment. We disagree. Procedural due process claimants must (1) "identify a constitutionally protected property or liberty interest"; and (2) "demonstrate that the government has deprived [them] of the interest without due process of law." *Weinstein v. Albright*, 261 F.3d 127, 134 (2d Cir. 2001). As discussed above, a facial claim must go further, showing that the challenged statute "cannot constitutionally be applied to anyone" because due process will be deprived in all circumstances. *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018).

When the deprivation in question occurs in the course of an "established state procedure," due process is satisfied by the "combination" of "some form of pre-deprivation hearing" and a "post-deprivation remedy" with "the opportunity to obtain full judicial review." *Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 466–67 (2d Cir. 2006). Pre-deprivation hearings "need not be elaborate," but must include "notice and an opportunity to respond." *Id.* at 467.

The Landlords claim that they will be deprived of a property interest when zero-vacancy presumptions that apply to nonresponsive landlords lower a municipality's vacancy rate to five percent or lower and the town subsequently enacts rent stabilization. The Adverse Inference Provision deprives them of due process in this scenario, they argue, because the Provision requires final, binding determinations as to the number of vacancies among properties owned by nonresponsive landlords, and prevents other landlords from contesting the overall vacancy rate by presenting other data.

The district court dismissed the Landlords' claim on the basis that they had adequate pre- and post-deprivation means to contest the results of vacancy studies. *Hudson Shore I*, 2024 WL 3212689, at *7–8. It held that the Hearing Provision, which requires municipalities to hold a public hearing on ten days' notice before declaring a housing emergency, provides a pre-deprivation remedy, and that "nothing in the [ETPA] . . . precludes a municipality from adjusting its calculation after hearing new evidence of a miscalculated rate at the public hearing." *Id.* at *7. Second, the district court found that Article 78 provides post-deprivation process. *Id.* at *8. Finally, it found that landlords have an additional post-deprivation remedy under § 8623(b), which requires local governments to suspend any

extant housing emergency on a showing that the vacancy rate has exceeded five percent. *Id.* We affirm on the basis that adequate pre- and post-deprivation process is available, and we express no view as to whether the Vacancy Provisions implicate a protected property interest.

### A. Pre-Deprivation Process

We agree with the district court that hearings mandated by the Hearing Provision can provide landlords "notice and an opportunity to respond" to a municipality's vacancy calculation, including any zero vacancy inferences that may be applied. *Rivera-Powell*, 470 F.3d at 467. Nothing in the ETPA describes what may or may not occur at public hearings, prevents landlords from presenting corrective data, or prevents towns from accepting it. N.Y. Unconsol. Law § 8623(c). Indeed, Poughkeepsie accepted corrective data presented at a hearing regarding its count of vacant units, leading to an upward revision in its vacancy rate calculation.[3] And even if a municipality declines to revise its calculation when confronted with corrective data, it could still use the data as a basis to decide against declaring a housing emergency.

The Landlords claim that the Adverse Inference Provision prohibits municipalities from accepting accurate vacancy counts regarding properties owned by nonresponsive landlords. They argue that the Provisions' mandate that nonresponsive owners "shall" be

---

[3] Resolution of the Common Council of the City of Poughkeepsie, No. R-24-45, June 18, 2024, https://cityofpoughkeepsie.com/DocumentCenter/View/3361/R-24-45-Resolution-Declaring-A-Housing-Emergency. The Landlords concede that Poughkeepsie upwardly revised its calculation and that its resolution reflecting as much "is a matter of public record." Landlords' Br. at 15 n.5. We therefore take notice of it. *Caha*, 152 U.S. at 222; *Giraldo*, 694 F.3d at 164.

assessed zero vacancies equates to a final determination.  N.Y. Unconsol. Law § 8623(f).  They also highlight that the Hearing Provision does not expressly allow local governments to consider corrective data.  These arguments ask us to narrowly interpret the ETPA in a way that creates rather than avoids constitutional conflict, and which rests on "speculation about the law's coverage and its future enforcement."  *Moody*, 603 U.S. at 723.  Though the Provision mandates that municipalities assess zero vacancies, it is silent as to when this presumption must be applied and how long it must last. And nothing in the Provision purports to ban municipalities from considering more accurate information at a later date.  Indeed, it more closely resembles an evidentiary presumption that may be rebutted.

Our preferred reading of the Vacancy Provisions aligns with the legislature's purpose in enacting them.  *See Lusk*, 475 F.3d at 496 ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, we may construe the statute to avoid such problems unless such construction is plainly contrary to the intent of the Legislature.").  The Legislature intended the Vacancy Provisions "to ensure that cities . . . are able to get *accurate* information" about vacancies.  App'x 284, N.Y. State Sen. Introducer's Mem. in Support of S.B. 2023-S1684A (2023) (emphasis added).  A reading of the ETPA that binds municipalities to zero-vacancy presumptions indefinitely would undermine this purpose by preventing them from collecting accurate data.

## B.  Post-Deprivation Process

We agree with the district court that Article 78 provides an adequate opportunity for landlords to contest vacancy calculations, including zero vacancy figures attributed to nonresponsive landlords,

after a housing emergency is declared.  We have long held that Article 78 provides a meaningful post-deprivation remedy sufficient to satisfy due process. *Locurto v. Safir*, 264 F.3d 154, 173–75 (2d Cir. 2001) (holding that "[a]n Article 78 proceeding . . . constitutes a wholly adequate post-deprivation hearing for due process purposes" and collecting cases).  And New York courts have specifically blessed Article 78 as a tool to challenge zero-vacancy presumptions.  The Adverse Inference Provision codified a practice that had been employed by ETPA-eligible municipalities to streamline vacancy studies for over four decades. *See Spring Valley*, 474 N.Y.S.2d at 315–16.  The Appellate Division, affirmed by the New York Court of Appeals, allowed zero-vacancy inferences so long as vacancy calculations were otherwise based on "a good-faith study . . . based on precise data." *Id*. at 316.  Even then, however, non-party landlords who felt that they "should not suffer the [distorting] consequences of the nonco-operation of the others" could still challenge zero vacancy presumptions by subpoenaing and "produc[ing] . . . the relevant statistics of the . . . noncomplying" landlords. *Id.*

The Landlords argue that the Adverse Inference Provision abrogates this remedy by codifying the zero-vacancy inference and making it mandatory.  Their argument again relies on the premise that the Provision mandates final determinations as to the number of vacant units owned by nonresponsive landlords.  As discussed above, we do not read the Adverse Inference Provision to create any more than a rebuttable presumption.  Even if it did require a final determination, however, a municipality's refusal to consider corrective data could still be considered arbitrary and capricious under the longstanding requirement that vacancy studies be conducted in "'good faith'" and be "derived from 'precise data.'"

24-1678-cv

*Exec. Towers at Lido, LLC v. City of Long Beach*, 831 N.Y.S.2d 445, 447 (2d Dep't 2007) (quoting *Spring Valley*, 474 N.Y.S.2d at 316).   We decline to speculate what effect, if any, the Vacancy Provisions may have on this standard.  *Wash. State Grange*, 552 U.S. at 450.[4]

\*   \*   \*

It is our duty to refrain from condemning democratically enacted laws wholesale as unconstitutional, save for those extraordinary circumstances in which a statute's bare requirements render its constitutional implementation impossible.  *Wash. State Grange*, 552 U.S. at 450.   Under a straightforward reading of the Vacancy Provisions, the Landlords have failed to plausibly allege that the Vacancy Provisions are unconstitutional "in all [their] applications."  *Patel*, 576 U.S. at 418.   Their reliance on improbable scenarios and tortured readings of the Vacancy Provisions would have us actively seek out constitutional difficulty.   Their claims were therefore rightfully dismissed.[5]

---

[4] In addition to holding that Article 78 provides a sufficient post-deprivation remedy, the district court also found an additional source of post-deprivation review in the form of § 8623(b).  *Hudson Shore I*, 2024 WL 3212689, at \*8.   This provision requires that a housing emergency "must be declared at an end," and stabilization suspended, "once the vacancy rate . . . exceeds five percent."  N.Y. Unconsol. Law § 8623(b).   We disagree that § 8623(b) represents "a meaningful opportunity to challenge the state[] action" in question, as is required to constitute adequate post-deprivation process.  *Rivera-Powell*, 470 F.3d at 468 n.9.   Ending an erroneous declaration after it has been in effect is not equivalent to reversing the initial declaration itself, as landlords may be subjected to stabilization for months or years before showing a higher vacancy rate, consequences for which § 8623(b) provides no remedy.

[5] In its brief, Nyack renews standing arguments that the district court denied as moot.  We have considered these arguments and find them irrelevant to the claims at issue on this appeal.

28

24-1678-cv

## CONCLUSION

For the forgoing reasons, we **AFFIRM** the judgment of the district court.